1  Daniel C. Girard (State Bar No. 114826)
   dcg@girardgibbs.com
2  Jonathan K. Levine (State Bar No. 220289)
   jkl@girardgibbs.com
3  Aaron M. Sheanin (State Bar No. 214472)
   ams@girardgibbs.com
4  **GIRARD GIBBS LLP**
   601 California Street, Suite 1400
5  San Francisco, CA 94108
   Telephone: (415) 981-4800
6  Facsimile: (415) 981-4846

7  Attorneys for Plaintiff Richard S. Bondar,
   As Trustee of the Bondar Family Trust Dated 4/1/91
8

9

10                **UNITED STATES DISTRICT COURT**

11             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12  RICHARD S. BONDAR, as Trustee of the          )  CIVIL ACTION NO. _____
    Bondar Family Trust Dated 4/1/91, Individually )
13  And On Behalf of All Others Similarly Situated, )
                                                    )  **CLASS ACTION COMPLAINT**
14              Plaintiff,                          )  **FOR VIOLATIONS OF**
                                                    )  **FEDERAL SECURITIES LAWS**
15              v.                                  )
                                                    )
16  BANK OF AMERICA CORPORATION,                    )  **JURY TRIAL DEMANDED**
    BANC OF AMERICA INVESTMENT                      )
17  SERVICES, INC., and BANC OF AMERICA             )
    SECURITIES, LLC,                                )
18                                                  )
                                                    )
19              Defendants.                         )
    _____           )

20

21                         **INTRODUCTION**

22      1.      This is a federal class action under Sections 10(b) and 20(a) of the Securities Exchange

23  Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and continue to

24  hold auction rate securities (also known as auction rate preferred stock, auction market preferred stock,

25  variable rate preferred securities, money market preferred securities, periodic auction rate securities and

26  auction rate bonds) offered for sale by defendants between May 22, 2003 and February 13, 2008,

27  inclusive (the "Class Period").

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

2.    Defendants represented to investors that auction rate securities were equivalent to cash or money market funds; were highly liquid, safe investments for short-term investing; and were suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3.    Defendants knew, but failed to disclose to investors, material facts about auction rate securities.  In particular, defendants knew, but failed to disclose that these auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer.  Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because defendants were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability.  Defendants knew, but failed to disclose that auction rate securities would become illiquid as soon as defendants stopped maintaining the auction market.

4.    On February 13, 2008, 87% of all auctions of auction rate securities failed when defendants and all other major broker-dealers refused to continue to support the auctions.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating investments Defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337.  Defendants regularly conduct business within this District, and many of the acts giving rise to the violations complained of herein took place in this District.

7.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**PARTIES**

8.      Plaintiff Richard S. Bondar, as Trustee of the Bondar Family Trust Dated 4/1/91 ("Bondar Family Trust"), as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities underwritten and sold by Defendants during the Class Period and continued to hold such auction securities as of February 13, 2008.

9.      Defendant Bank of America Corporation is a North Carolina corporation headquartered in Charlotte, North Carolina. Bank of America Corporation is a bank holding company and a financial holding company registered under the Gramm-Leach-Bliley Act. Bank of America Corporation is one of the world's leading financial firms and one of the largest banks in the United States by assets. Bank of America Corporation conducts substantial business within this District.

10.     Defendant Banc of America Investment Services, Inc. ("BAIS"), is incorporated in Florida and its principal executive offices are located in Charlotte, North Carolina. BAIS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). BAIS is a wholly owned subsidiary of Bank of America Corporation. BAIS conducts substantial business within this District.

11.     Defendant Banc of America Securities, LLC ("BAS") is incorporated in Delaware, and its principal executive offices are located in Charlotte, North Carolina. BAS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). BAS is a wholly owned subsidiary of Bank of America Corporation. BAS conducts substantial business within this District.

12.     Unless specifically noted, "Bank of America" refers collectively to Defendants Bank of America Corporation, BAIS and BAS.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

13.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased auction rate securities from Bank of America between May 22, 2003 and February 13, 2008, inclusive, and

- 3 -

1    continued to hold such auction securities as of February 13, 2008 (the "Class").  Excluded from the

2    Class are defendants, the officers and directors of any defendant, members of their immediate families

3    and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or

4    had a controlling interest.

5        14.    The members of the Class are so numerous that joinder of all members is impracticable.

6    The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the

7    United States and Bank of America was a significant underwriter and seller of auction rate securities

8    while the market for such securities existed.  While the exact number of Class members is unknown to

9    plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that

10   there are thousands of members in the proposed Class.  Record owners and other members of the Class

11   may be identified from records maintained by defendants and may be notified of the pendency of this

12   action by mail, using the form of notice similar to that customarily used in securities class actions.

13       15.    Common questions of law and fact exist as to all members of the Class and predominate

14   over any questions solely affecting individual members of the Class.  Among the questions of law and

15   fact common to the Class are:

16       (a)    Whether the federal securities laws were violated by defendants' acts as alleged

17       herein;

18       (b)    Whether statements made by defendants to the investing public during the Class

19       Period misrepresented or omitted material facts about the liquidity of and risks associated

20       with auction rate securities and the market for such securities; and

21       (c)    To what extent the members of the Class have sustained damages and the proper

22       measure of damages.

23       16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of

24   the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

25   complained of herein.

26       17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and

27   has retained counsel competent and experienced in class and securities litigation.

28

- 4 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

18.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

19.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because:    (a) the prosecution of separate actions by individual Class members, would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## GENERAL ALLEGATIONS
### Background

20.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions."    Auction rate securities generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

21.    Since then, the market for auction rate securities grew dramatically and the current estimated value of auction rate securities in existence (prior to the collapse of the auction market) is around $350 billion.

22.    Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000.  In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

- 5 -

23.     Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction.  The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities.

24.     The number of days between each auction was set by the prospectus.  Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

25.     The auction itself was of the type commonly referred to as a "Dutch" auction, i.e. one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction.  For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

26.     At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate."  The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction.  If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders.  The auction agent, at the end of the auction, allocated the shares per the formula.  If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus.  This rate was generally lower than the market rate.

27.     During an auction, an investor could submit one of four different orders:  (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate.  Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

28.     If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred.  In this situation, the rate was set to a "maximum rate" described by either a

- 6 -

1   formula or a multiplier of a reference rate, such as the Bond Market Association index.  Either way, the

2   maximum rate was set out in the prospectus.  If the auction failed then none of the current shareholders

3   could sell their shares, no matter what type of order they issued.  The maximum rate for many auction

4   rate securities, particularly those invested in corporate debt securities or preferred stocks, was relatively

5   small, however.  As a result, if the auction failed, owners unable to sell their shares would receive

6   limited interest on their illiquid investments.

7          29.    The issuer of each auction rate security selected one or more broker-dealers to underwrite

8   the offerings and to manage the auction process.  Investors could only submit orders through the

9   selected broker-dealers.  The issuer paid an annualized fee to each broker-dealer engaged to manage an

10  auction.

11         30.    Investors were required to submit an order to the broker-dealer by a deadline set by the

12  broker-dealer.  This deadline was generally set early enough by the broker-dealer so that it had time to

13  process and analyze the orders before having to submit the orders to the auction agent.  This gave the

14  broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its

15  own account.

16         31.    Broker-dealers would often engage in a number of practices to influence the auction

17  process, including, for example, submitting their own orders to purchase or sell shares for their own

18  accounts.  In 2004, the SEC began to investigate these manipulative practices affecting the auction

19  market.  In 2006, the SEC entered into a consent decree with a number of major broker-dealers,

20  including defendant BAS, which required them to disclose certain practices to investors and to stop

21  engaging in certain other practices.  The SEC consent decree noted that in many cases, the broker-

22  dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed.

23  The consent decree did nothing to end the practice of the broker-dealers submitting bids for their own

24  accounts after receiving notice of what orders their customers planned to place, so long as the broker-

25  dealers disclosed this practice to their customers.

26

27

28

- 7 -

**During the Class Period, Bank of America Materially Misrepresented
the Liquidity of and Risks Associated With Auction Rate Securities
and Omitted Material Facts About Its Role and the Auction Market**

32.    Auction rate securities were extremely profitable for Bank of America and for the Bank of America financial advisors and brokers who sold the securities. As a large underwriter of auction rate securities, Bank of America was paid significant underwritten fees by issuers of the securities. As a large broker-dealer, Bank of America was paid to make a market in auction rate securities. Bank of America also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account. Individual Bank of America financial advisors had a significant financial incentive to sell auction rate securities, as they were compensated by Bank of America for each auction rate security sold.

33.    In order to perpetuate the auction market and sell as many auction rate securities as possible, Bank of America represented to investors in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term investing. Pursuant to uniform sales materials and top-down management directives, Bank of America financial advisors throughout the United States represented to current and potential Bank of America clients that the auction rate securities sold by Bank of America were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

34.    Bank of America failed to disclose to purchasers of auction rate securities material facts about these securities. Bank of America failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Bank of America failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because Bank of America and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. In fact, at all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by Bank of America and the other broker-dealers. When Bank of America and the

- 8 -

1  other broker-dealers stopped artificially supporting and manipulating the auction market, the market

2  immediately collapsed and the auction rate securities sold by Bank of America became illiquid.  Bank of

3  America also failed to disclose that the auction rate securities it was selling were not short-term

4  investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30

5  years.  Finally, Bank of America failed to disclose that the short-term nature of the securities and the

6  ability of investors to quickly convert their auction rate securities into cash depended entirely on the

7  perpetuation of the artificial auction market being maintained by Bank of America and the other broker-

8  dealers.

9          35.    Bank of America also failed to disclose to purchasers of auction rate securities material

10  facts about its role in the auctions and the auction market in which these securities were traded.  Bank of

11  America failed to disclose that in connection with the sale of auction rate securities, Bank of America

12  simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible

13  interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own

14  behalf, to maximize the return to Bank of America on its holdings of the auction rate securities.  Bank of

15  America failed to disclose that it and other broker-dealers routinely intervened in auctions for their own

16  benefit, to set rates and prevent all-hold auctions and failed auctions.  Bank of America failed to disclose

17  that without this manipulation of the auction market, many auctions likely would have failed, as a result

18  of which investors would have had the ability to determine the true risk and liquidity features of auction

19  rate securities.  Bank of America continued to aggressively market auction rate securities after it had

20  determined that it and other broker dealers were likely to withdraw their support for the periodic

21  auctions and that a "freeze" of the market for auction rate securities would result.

22          36.    During the Class Period, Bank of America failed to disclose that the auctions it was

23  conducting were not governed by arms-length transactions but instead suffered from systemic flaws and

24  manipulative practices, including allowing customers to place open or market orders in auctions,

25  intervening in auctions by bidding for Bank of America's proprietary account or asking customers to

26  make or change orders, preventing failed auctions and all-hold auctions to set the market rate,

27  submitting or changing orders after auction deadlines, not requiring customers to purchase partially-

28  filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate,

and providing inside information about the auction process to certain customers in connection with the auction bidding.

### The Market for Auction Rate Securities Collapses

37.    In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market. In the fall-winter of 2007, more auctions began to fail.  Even though a number of auctions failed in September 2007 and thereafter, Bank of America continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

38.    On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers refused to continue to support the auctions.

39.    On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

40.    The market for auction rate securities sold by Bank of America was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed.  As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by Bank of America traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased and continued to hold auction rate securities sold by Bank of America relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

41.    During the Class Period, defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by Bank of America by publicly issuing false and misleading statements and omitting to disclose material facts

- 10 -

1    necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements

2    and omissions were materially false and misleading in that they failed to disclose material adverse

3    information and misrepresented the truth about the auction market and the auction rate securities sold by

4    Bank of America, as alleged herein.

5         42.    At all relevant times, the material misrepresentations and omissions particularized in this

6    Complaint directly or proximately caused or were a substantial contributing cause of the damages

7    sustained by plaintiff and other members of the Class. As described herein, during the Class Period,

8    defendants made or caused to be made a series of materially false or misleading statements about the

9    auction market and the auction rate securities sold by Bank of America. These material misstatements

10   and omissions had the cause and effect of perpetuating the auction market and creating in that market an

11   unrealistically positive assessment of the auction rate securities sold by Bank of America, thus causing

12   those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially

13   false and misleading statements during the Class Period resulted in plaintiff and other members of the

14   Class purchasing and continuing to hold auction rate securities sold by Bank of America at artificially

15   inflated prices, thus causing the damages complained of herein.

16                                          **NO SAFE HARBOR**

17        43.    The statutory safe harbor provided for forward-looking statements under certain

18   circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The

19   statements pleaded herein were not identified as "forward-looking statements" when made. To the

20   extent there were any forward-looking statements, there were no meaningful cautionary statements

21   identifying important factors that could cause actual results to differ materially from those in the

22   purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does

23   apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-

24   looking statements because at the time each of those forward-looking statements was made, the

25   particular speaker knew that the particular forward-looking statement was false, and/or the forward-

26   looking statement was authorized and/or approved by an executive officer of Bank of America who

27   knew that those statements were false when made.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**LOSS CAUSATION/ECONOMIC LOSS**

44.    During the Class Period, as detailed herein, defendants engaged in a scheme and course of conduct to create a market for and artificially inflate the price of auction rate securities sold by Bank of America that operated as a fraud or deceit on purchasers of auction rate securities sold by Bank of America by misrepresenting the liquidity of and risks associated with such securities.  Defendants achieved this by making false and misleading statements about the auction market and the auction rate securities sold by Bank of America.  When Bank of America's prior misrepresentations and omissions were disclosed and became apparent to the investing public, the market for auction rate securities collapsed and the auction rate securities sold by Bank of America have become illiquid.  As a result of their purchases of auction rate securities from Bank of America during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws in that the securities have substantially less value than that represented by defendants.

45.    The collapse of the auction rate securities market at the end of the Class Period was a direct result of defendants' unilateral decision to no longer artificially support the auction rate securities market and the nature and extent of defendants' fraud finally being revealed to investors.

**BASIS OF ALLEGATIONS**

46.    Plaintiff makes the allegations in this Complaint based upon the investigation of plaintiff's counsel, which included a review of SEC filings, regulatory filings and reports, securities analysts' reports, interviews with purchasers of auction rate securities, press releases and media reports, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**COUNT I**

**Violation Of Section 10(b) Of The Exchange Act**
**Against All Defendants**

47.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of himself, as trustee of the Bondar Family Trust, and the Class.

- 12 -

48.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable defendants to sell hundreds of millions of dollars of auction rate securities to current and prospective Bank of America clients, and on which Bank of America made substantial commissions; and (iii) cause plaintiff and other members of the Class to purchase auction rate securities from Bank of America at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

49.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Bank of America in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate securities sold by Bank of America, as specified herein.

51.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by Bank of America were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

1   business which operated as a fraud and deceit upon the purchasers of auction rate securities from Bank

2   of America during the Class Period.

3        52.    The defendants had actual knowledge of the misrepresentations and omissions of material

4   facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to

5   disclose such facts.  Such defendants' material misrepresentations and/or omissions were done

6   knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of

7   and risks associated with auction rate securities from the investing public and supporting the artificially

8   inflated price and market for these securities.  If defendants did not have actual knowledge of the

9   misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by

10  deliberately refraining from taking those steps necessary to discover whether those statements were false

11  or misleading.

12       53.    As a result of the dissemination of the materially false and misleading information and

13  failure to disclose material facts, as set forth above, the market and market price of the auction rate

14  securities sold by Bank of America was artificially inflated during the Class Period.  In ignorance of the

15  fact that the market prices of auction rate securities were artificially inflated, and relying directly or

16  indirectly on the false and misleading statements made by defendants, or upon the integrity of the

17  auction market in which the auction rate securities were traded, and/or on the absence of material

18  adverse information that was known to or deliberately disregarded by defendants but not disclosed in

19  public statements by defendants during the Class Period, plaintiff and the other members of the Class

20  acquired and continued to hold auction rate securities sold by Bank of America during the Class Period

21  at artificially high prices and were damaged thereby.

22       54.    At the time of said misrepresentations and omissions, plaintiff and other members of the

23  Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members

24  of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the

25  auction rate securities sold by Bank of America, which were not disclosed by defendants, plaintiff and

26  other members of the Class would not have purchased and continued to hold their auction rate securities,

27  or, if they had acquired such securities during the Class Period, they would not have done so at the

28  artificially inflated prices which they paid.

55.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Bank of America during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendant Bank of America Corporation

57.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of himself, as trustee of the Bondar Family Trust, and the Class.

58.    Defendant Bank of America Corporation acted as a control person of defendants BAIS and BAS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its 100% ownership of BAIS and BAS, Bank of America Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making by BAIS and BAS, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Bank of America Corporation was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.    As set forth above, BAIS and BAS violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of its position as a controlling person, Bank of America Corporation is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Bank of America during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 22, 2008                    Respectfully submitted,

**GIRARD GIBBS LLP**

By: _Aaron M. Sheanin_
    Aaron M. Sheanin

Daniel C. Girard
Jonathan K. Levine
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

- 16 -

Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

**Counsel for Plaintiff Richard S. Bondar,**
**As Trustee of the Bondar Family Trust Dated 4/1/91**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

### CERTIFICATION OF PROPOSED LEAD PLAINTIFF
### PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Richard S. Bondar, as Trustee of the Bondar Family Trust Dated 4/1/91 ("Bondar Family Trust") declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I am the Trustee of the Bondar Family Trust and am authorized to commence legal action on behalf of the Bondar Family Trust and to seek the Bondar Family Trust's appointment as lead plaintiff in an action brought under the federal securities laws.

2.    I have reviewed the complaint against Bank of America Corporation and its affiliates ("Bank of America"), prepared by Girard Gibbs LLP. On behalf of the Bondar Family Trust, I designate Girard Gibbs as counsel for the Bondar Family Trust in this action for all purposes.

3.    The Bondar Family Trust did not acquire any auction rate securities from Bank of America at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

4.    The Bondar Family Trust is willing to serve as a lead plaintiff either individually or as part of a group. On behalf of the Bondar Family Trust, I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

5.    The Bondar Family Trust will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

1

6.     The Bondar Family Trust has not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

7.     On behalf of the Bondar Family Trust, I understand that this is not a claim form, and that the Bondar Family Trust's ability to share in any recovery as a class member is not affected by its decision to serve as a representative party.

8.     The Bondar Family Trust's purchases and sales of auction rate securities sold to it through Bank of America during the class period are attached as **Attachment A** to this document.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of April, 2008

_____, TTE
Richard S. Bondar

2

**ATTACHMENT A**

**RICK BONDAR'S, AS TRUSTEE FOR THE BONDAR FAMILY TRUST DATED
4/1/91, TRANSACTIONS IN AUCTION RATE
SECURITIES SOLD BY BANK OF AMERICA BETWEEN
APRIL 24, 2003 AND FEBRUARY 13, 2008**

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| September 21, 2007 | National Collegiate Student Loan Trust 2007-4 CL A2A4 | 4 | $25,000 | Bought |
| December 10, 2007 | Citizens Property Insurance Corporation Series 2006A-21 | 4 | $25,000 | Bought |
| January 1, 2008 | National Collegiate Student Loan Trust 2007-4 CL A2A4 | 8 | $25,000 | Bought |
| February 8, 2008 | National Collegiate Student Loan Trust 2007-4 CL A2A4 | 8 | $25,000 | Sold |
| February 11, 2008 | South Carolina Student Loan Corp. Series A-4 | 4 | $25,000 | Bought |
| February 12, 2008 | Nelnet Student Loan Trust Series 2003-2 | 4 | $25,000 | Bought |
| February 28, 2008 | Citizens Property Insurance Corporation Series 2006A-21 | 4 | $25,000 | Sold |

**JS 44** (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| RICK BONDAR, as Trustee of The Bondar Family Trust dated 4/1/91, And On Behalf of All Others Similarly Situated | BANK OF AMERICA CORP., BANC OF AMERICA INVESTMENT SERVICES, INC., BANC OF AMERICA SECURITIES LLC |

| (b) County of Residence of First Listed Plaintiff  Riverside, California<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
|---|---|

| (c) Attorney's (Firm Name, Address, and Telephone Number)<br><br>Daniel C. Girard, Jonathan K. Levine, Aaron M. Sheanin<br>Girard Gibbs LLP<br>601 California Street, 14th Floor, San Francisco, CA 94108<br>(415) 981-4800 | Attorneys (If Known) |
|---|---|

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus – Alien Detainee<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sections 78j, 78t; Violation of the Securities Exchange Act of 1934

Brief description of cause:
Private Securities Litigation Reform Act

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
May 22, 2008

SIGNATURE OF ATTORNEY OF RECORD
*Aaron M. Sheanin*