DEBRA S. BELAGA (S.B. #083237)
AARON M. ROFKAHR (S.B. #227008)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
Email: dbelaga@omm.com
arofkahr@omm.com

JONATHAN ROSENBERG (admitted *pro hac vice*)
B. ANDREW BEDNARK (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrosenberg@omm.com
abednark@omm.com

ROBERT M. STERN (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: rstern@omm.com

*Attorneys for Defendants Bank of America Corporation, Banc of America Investment Services, Inc., and Banc of America Securities LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE Bank of America Corp. Auction Rate Securities Marketing Litigation:

RICHARD S. BONDAR, as Trustee of the Bondar Family Trust Dated 4/1/91, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BANK OF AMERICA CORPORATION, BANC OF AMERICA INVESTMENT SERVICES, INC., and BANC OF AMERICA SECURITIES LLC,

Defendants.

MDL No. 09-2014

This Document Relates to:

Case No. C08-02599 JSW

**DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: November 20, 2009
Time: 9:00 a.m.
Place: Courtroom 11, 19th Floor
Judge: Jeffrey S. White

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

NOTICE OF MOTION AND MOTION ........ viii

STATEMENT OF ISSUES TO BE DECIDED ........ ix

SUMMARY OF ARGUMENT ........ x

STATEMENT OF FACTS ........ 1

ARGUMENT ........ 4

I. THE SECTION 10(b) CLAIMS (COUNTS I AND III) SHOULD BE DISMISSED ........ 4

A. The SAC does not plead fraud with particularity (Counts I and III) ........ 5

1. The SAC does not plead manipulative conduct with particularity (Count I) ........ 5

a. The SAC does not specify who perpetrated the allegedly manipulative acts ........ 5

b. The SAC does not particularize when the alleged manipulation occurred ........ 6

c. The SAC does not allege what acts were manipulative or how the alleged manipulation occurred ........ 6

2. The SAC fails to particularize misleading statements to investors who purchased ARS directly from BofA (Count III) ........ 8

B. The SAC's factual allegations do not give rise to a "strong inference" that BofA acted with scienter (Counts I and III). ........ 10

1. The SAC does not identify who committed the alleged fraud ........ 11

2. The SAC fails to particularize facts constituting strong circumstantial evidence of intentional or conscious misconduct ........ 12

a. Generalized references to "senior management" are inadequate ........ 13

b. The SAC's reference to a lone presentation is inconclusive ........ 14

c. Allegations that BofA sold its ARS inventory merely describe a routine business operation ........ 15

d. BofA's alleged efforts to influence ARS issuers' credit ratings do not provide a strong inference of scienter ... 16

e. The SAC's references to regulatory investigations are insufficient ... 16

3. The SAC's allegations as a whole do not give rise to a strong scienter inference ... 17

C. The SAC does not plead reliance (Counts I and III) ... 20

1. The Class cannot obtain a presumption of reliance based on conclusory allegations of "standardized sales pitches." ... 20

2. No presumption of reliance is warranted based on the SAC's conclusory allegations that Class members "reasonably assumed" that BAS did not intervene in auctions ... 20

3. The Class may not rely on the fraud-created-the-market presumption ... 22

D. The SAC fails to plead adequately that BofA's conduct caused plaintiffs' alleged loss (Counts I and III) ... 23

II. THE SECTION 20(a) CLAIMS AGAINST BAC AND BAS (COUNTS II AND IV) FAIL BECAUSE THE PRIMARY SECTION 10(b) CLAIMS FAIL ... 25

III. THE SAC SHOULD BE DISMISSED WITH PREJUDICE ... 25

CONCLUSION ... 25

# TABLE OF AUTHORITIES

## CASES

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005) .......... 24

*Allison v. Brooktree Corp.*,
999 F. Supp. 1342 (S.D. Cal. 1998) .......... 12

*In re Apple Computer, Inc. Sec. Litig.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002) .......... 11

*Arena Land & Inv. Co. v. Petty*,
906 F. Supp. 1470 (D. Utah 1994) .......... 22

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .......... xi, 5, 7, 21

*In re Auction Rate Sec. (ARS) Mktg. Litig.*,
581 F. Supp. 2d 1371 (J.P.M.L. 2008) .......... 20

*Bennett v. H&R Block Fin. Advisors, Inc.*,
No. C 04-4848 MHP, slip op. (N.D. Cal. June 1, 2005) .......... xi, 13, 14, 15, 17, 20

*Bennett v. H&R Block Fin. Advisors, Inc.*,
No. C 04-4848, 2005 U.S. Dist. LEXIS 25273 (N.D. Cal. Oct. 27, 2005) .......... xii, 24

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) .......... 20

*Brodsky v. Yahoo! Inc.*,
No. C 08-2150, 2009 U.S. Dist. LEXIS 51281 (N.D. Cal. June 18, 2009) .......... 13

*In re Bus. Objects S.A. Sec. Litig.*,
No. C 04-2401, 2005 U.S. Dist. LEXIS 20215 (N.D. Cal. July 27, 2005) .......... 17

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) .......... 8

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... 22

*Colan v. Mesa Petroleum Co.*,
951 F.2d 1512 (9th Cir. 1991) .......... 23

*In re Ditech Commc'ns Corp. Sec. Litig.*,
No. C 05-2406, 2007 U.S. Dist. LEXIS 78411 (N.D. Cal. Oct. 11, 2007) .......... 10

*In re Doral Fin. Corp. Sec. Litig.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008) .......... 18

*In re Dot Hill Sys. Corp. Sec. Litig.*,
No. 06CV228, 2008 U.S. Dist. LEXIS 88791 (S.D. Cal. Sept. 2, 2008) .......... 19

*In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06CV228, 2009 U.S. Dist. LEXIS 22022 (S.D. Cal. Mar. 18, 2009) .............................. 9

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .............................. xii, 23

*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008) .............................. 11, 12, 17

*Glenbrook Capital Ltd. P'ship v. Kuo*, No. C 07-2377, 2009 U.S. Dist. LEXIS 30745 (N.D. Cal. Mar. 30, 2009) .............................. 11, 23, 25

*In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................. 13

*In re Harmonic Sec. Litig.*, 163 F. Supp. 2d 1079 (N.D. Cal. 2001) .............................. 9

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) .............................. 21

*In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566 (S.D.N.Y. 2005) .............................. 20

*In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-2544, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) .............................. 11, 12, 15

*J&R Mktg., SEP v. Gen'l Motors Corp.*, No. 06-10201, 2007 U.S. Dist. LEXIS 13227 (E.D. Mich. Feb. 27, 2007) .............................. 16

*In re Jenny Craig Sec. Litig.*, No. 92-845, 1992 U.S. Dist. LEXIS 22769 (S.D. Cal. Dec. 22, 1992) .............................. 22

*In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007) .............................. 23

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .............................. xii, 23

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006) .............................. 24

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002) .............................. 14

*Lory v. Ryan*, No. CV 07-2174, 2008 U.S. Dist. LEXIS 84478 (D. Ariz. Oct. 20, 2008) .............................. 18

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, No. 07-5423, 2009 U.S. Dist. LEXIS 74382 (E.D. Pa. Aug. 20, 2009) .............................. 24

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) .............................. 12

*McCasland v. Formfactor Inc.*,
No. C 07-5545, 2008 U.S. Dist. LEXIS 60544 (N.D. Cal. July 25, 2008) .......................... 11

*McCasland v. Formfactor Inc.*,
No. C 07-5545, 2009 U.S. Dist. LEXIS 59996 (N.D. Cal. July 14, 2009) .................... 18, 25

*In re MDC Holdings Sec. Litig.*,
754 F. Supp. 785 (S.D. Cal. 1990) .......................................................................... 22

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
No. 02 Civ. 9690, 2008 U.S. Dist. LEXIS 44344 (S.D.N.Y. June 4, 2008) ........................ 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71 (2006) ................................................................................................ 8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................... 14, 15, 23

*Moore v. Kayport Package Express, Inc.*,
885 F.2d 531 (9th Cir. 1989) ........................................................................ 5, 6

*Morgan v. AXT, Inc.*,
No. C 05-5106, 2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sept. 23, 2005) ......................... 14

*Openwave Sys. Inc. v. Fuld*,
No. C 08-5683, 2009 U.S. Dist. LEXIS 48206 (N.D. Cal. June 6, 2009) ...................... xi, 10

*Pittleman v. Impac Mortgage Holdings, Inc.*,
No. CV 07-970, 2009 U.S. Dist. LEXIS 18213 (C.D. Cal. Mar. 9, 2009) ............... xi, 19, 25

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ....................................................................................... 8

*Ross v. Bank S., N.A.*,
885 F.2d 723 (11th Cir. 1989) .................................................................................. 22

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) .................................................................................. 17

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) ................................................................................................. 7

*Seattle Pacific Indus., Inc. v. Melmarc Prods., Inc.*,
No. C 06-834, 2007 U.S. Dist. LEXIS 7547 (W.D. Wash. Jan. 31, 2007) .......................... 10

*Segal Co. (E. States), Inc. v. Amazon.com*,
280 F. Supp. 2d 1229 (W.D. Wash. 2003) ................................................... xi, 6, 10

*Shivers v. Amerco*,
670 F.2d 826 (9th Cir. 1982) ....................................................................................... 7

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ............................................................................. 10, 14

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
No. C 05-0295, 2006 U.S. Dist. LEXIS 14790 (N.D. Cal. Mar. 10, 2006) .......................... 18

*South Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......................... 17

*Stinson v. Van Valley Dev. Corp.*,
714 F. Supp. 132 (E.D. Pa. 1989) .......................... 22

*Sullivan & Long, Inc. v. Scattered Corp.*,
47 F.3d 857 (7th Cir. 1995) .......................... 21

*Starr v. Georgeson S'holder, Inc.*,
412 F.3d 103 (2d Cir. 2005) .......................... 21

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) .......................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......................... 11, 19

*In re Towers Fin. Corp. Noteholders Litig.*,
No. 93 Civ. 810, 1995 U.S. Dist. LEXIS 21147 (S.D.N.Y. Sept. 20, 1995) .......................... 22

*United States v. SmithKline Beecham Clinical Labs.*,
245 F.3d 1048 (9th Cir. 2001) .......................... 6

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004) .......................... 13

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
No. C 02-3383, 2004 U.S. Dist. LEXIS 24866 (N.D. Cal. July 27, 2004) .......................... 21, 22

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .......................... 8

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......................... 13, 19

*Woods v. Asset Res.*,
No. 06 cv 398, 2006 U.S. Dist. LEXIS 94325 (E.D. Cal. Dec. 21, 2006) .......................... 9

*In re WorldCom, Inc. Sec. Litig.*,
336 F. Supp. 2d 310 (S.D.N.Y. 2004) .......................... 20

*In re Worlds of Wonder Sec. Litig.*,
694 F. Supp. 1427 (N.D. Cal. 1988) .......................... 5

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......................... xi, 11, 13, 15, 17

**STATUTES**

15 U.S.C. § 78u-4 .......................... 8, 11

**RULES**

Fed. R. Civ. P. 9(b) .......... *passim*
Fed. R. Civ. P. 12(b)(6).......... *passim*

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on November 20, 2009, at 9:00 a.m., in the courtroom of the Honorable Jeffrey S. White of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, defendants Bank of America Corporation, Banc of America Investment Services, Inc., and Banc of America Securities LLC shall and hereby do move the Court for an order dismissing with prejudice plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities Laws ("SAC").

This motion is brought under the Private Securities Litigation Reform Act of 1995 and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that the SAC fails to plead fraud with particularity and to state a claim upon which relief may be granted. This Motion will be based upon this Notice of Motion and Motion, the following Memorandum of Points and Authorities, and the Request for Judicial Notice filed herewith, and files and records in this action.

## STATEMENT OF ISSUES TO BE DECIDED

1. The PSLRA and Rule 9(b) require plaintiffs to plead with particularity the circumstances surrounding alleged market manipulation and misleading statements. Here, Lead Plaintiffs have not identified who manipulated the ARS auctions at issue, when that manipulation occurred, or how that manipulation was accomplished. Nor do they particularize facts showing that defendants made allegedly misleading statements to all of BofA's individual ARS customers across the country. Have Lead Plaintiffs satisfied the PSLRA's and Rule 9(b)'s heightened pleading requirements?

2. A Section 10(b) securities-fraud complaint must state particularized facts giving rise to a strong inference at least as compelling as any opposing inference that defendants acted with fraudulent intent. Here, Lead Plaintiffs have identified no specific individuals who had fraudulent intent, nor have they alleged any contemporaneous facts to render an inference of deceptive intent more compelling than the inference that the February 2008 auction failures were merely an unforeseen casualty of the current global financial crisis. Should the SAC be dismissed because it pleads only fraud by hindsight?

3. A complaint that does not allege each putative class member's direct reliance on defendants' alleged conduct must plead facts to show that such reliance should be presumed. In this action, putative Class members purchased various different ARS that traded at different auctions, in which Class members participated through unique point-of-sale conversations with different broker-dealers and different account representatives. Have plaintiffs pleaded sufficient facts to warrant a presumption that all putative class members relied on BofA's alleged representations and conduct?

4. A securities-fraud complaint must plead facts showing that the alleged loss resulted from defendants' fraud, rather than from market-wide conditions. Here, Lead Plaintiffs admit that the Class's alleged loss occurred when all major broker-dealers withdrew their support for ARS auctions. Does the SAC adequately plead that BofA caused the alleged loss?

## SUMMARY OF ARGUMENT[1]

Plaintiffs' third complaint in this action is another fraud-by-hindsight pleading that seeks to recover for lost liquidity arising out of the global credit crisis. For more than twenty years, investment banks and broker-dealers sold "auction-rate securities" (ARS), a rated investment product that had helped numerous government entities and other issuers raise billions in capital, and had provided thousands of individual and institutional investors with stable and higher-yielding yet liquid investments. ARS are asset-backed, long-term securities that financial institutions underwrite for issuers, and investors trade in periodic auctions in which the securities' interest rates are bid up and down. ARS is a catch-all descriptive that encompasses many different types of (i) issuers, ranging from municipalities to closed-end funds; (ii) assets backing the securities, ranging from student loans to mortgages; and (iii) ratings, ranging from AAA on down. In 2007, the subprime mortgage crisis hit, and auctions for ARS backed by subprime-mortgage assets began to fail (meaning that the holders of those securities could not sell them in the periodic auctions). And the ensuing credit crisis eventually spread to other ARS auctions. On February 13, 2008, nearly 90% of all ARS auctions failed, leaving most ARS investors unable to sell their securities at par value.

A putative class of investors who purchased ARS (i) for which BAS served as auction dealer (which the SAC defines as "BA ARS") or (ii) directly from BAS or BAIS, now alleges that BofA single-handedly caused the auctions' sudden serial failures through an allegedly fraudulent scheme to manipulate "the ARS market" and conceal its risks. But if BofA actually had such awesome power, then surely it could have avoided the $216 million loss[2] that it too suffered when the credit crisis spread to ARS auctions that had not failed in a generation. Far more compelling than the SAC's remote theory is the inference that no fraud occurred—the SAC, like other recent

---

[1] This memorandum refers to (i) the three defendants, collectively, as "BofA"; (ii) Banc of America Securities LLC as "BAS"; (iii) Bank of America Corporation as "BAC"; (iv) Banc of America Investment Services, Inc. as "BAIS"; (v) the Private Securities Litigation Reform Act of 1995 as the "PSLRA"; (vi) auction-rate securities as "ARS"; (vii) plaintiffs' Second Amended Class Action Complaint as "SAC"; and (viii) Lead Plaintiff N.R. Hamm Quarry, Inc. as "Hamm." And unless otherwise indicated, all emphases in quotations are added and internal citations and quotation marks are omitted.

[2] (*See* SAC ¶ 110.)

(and unsuccessful) fraud complaints, merely describes "a volatile industry at the onset of a long, destructive economic downturn." *Pittleman v. Impac Mortgage Holdings, Inc.*, No. CV 07-970, 2009 U.S. Dist. LEXIS 18213, at *10 (C.D. Cal. Mar. 9, 2009). Thus, not surprisingly, the SAC is light on particularity and heavy on bare conclusions, and fails for four reasons.

First, the SAC fails to plead either manipulative acts or misrepresentations in accordance with Rule 9(b)'s and the PSLRA's heightened pleading requirements: (i) the Class, which includes investors who never dealt with BofA (like Lead Plaintiff Ed O'Gara), has not pleaded BofA's alleged market manipulation (Count I) with particularity; and (ii) a substantially smaller portion of the Class—those who purchased ARS directly from BofA—has not alleged with particularity that BofA made any classwide statements, only alleged misrepresentations to one customer (Lead Plaintiff N.R. Hamm Quarry, Inc.) by its account representatives (Count III). *See ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *Openwave Sys. Inc. v. Fuld*, No. C 08-5683, 2009 U.S. Dist. LEXIS 48206, at *14 (N.D. Cal. June 6, 2009); *Segal Co. (E. States), Inc. v. Amazon.com*, 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003).

Second, the SAC does not plead particularized facts supporting a strong inference that any BofA entity—let alone all three entities that plaintiffs lump together—had any fraudulent intent. It does not attribute such intent to any individual, nor does it allege strong circumstantial facts from which to infer that any BofA entity intentionally or consciously made any misrepresentation or engaged in any manipulative conduct. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *Pittleman*, 2009 U.S. Dist. LEXIS 18213, at *10; *Bennett v. H&R Block Fin. Advisors*, No. C 04-4848, slip op. at 10 (N.D. Cal. June 1, 2005) ("*Bennett I*") (attached at Tab 2).

Third, the SAC does not adequately plead class-wide reliance. The presumption of reliance that normally applies to claims involving exchange-traded securities is not available here, because there was no single "efficient market" for ARS. Rather, the Class's misrepresentation claim amalgamates thousands of point-of-sale transactions involving different types of ARS where numerous BofA account representatives allegedly spoke individually to some Class members (like Hamm) but not to others (like O'Gara). A reliance presumption is equally

unavailable for the market-manipulation claim, because plaintiffs' "assumption" that ARS traded in an efficient market free of BAS's participation was unreasonable in light of ample disclosures describing BAS's participation in ARS auctions for its own account.

Fourth, the SAC does not plead loss causation because it does not isolate the loss, if any, due to BofA's conduct from the loss attributable to the market-wide financial crisis. To the contrary, it affirmatively alleges that BofA alone could not have caused the auction failures. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *Bennett v. H&R Block Fin. Advisors*, Inc., No. C 04-4848, 2005 U.S. Dist. LEXIS 25273, at *7-8 (N.D. Cal. Oct. 27, 2005).

**STATEMENT OF FACTS**

ARS are long-term bonds that pay interest at rates established by periodic (weekly or monthly) auctions. (SAC ¶¶ 30, 34.) After they were first introduced in 1984 (*id.* ¶ 32), ARS became attractive to investors because they combined the stability of long-term debt with the likely liquidity of a short-term investment (*id.* ¶ 35), often at returns well above other similarly liquid investments. This was because (i) despite ARS' long-term maturities, the auctions provided investors the opportunity to sell their ARS in the short term (*id.* ¶ 34); and (ii) ARS interest rates could change at each auction (*id.* ¶ 37), frequently to levels higher than the average interest rates guaranteed in the securities' offering memoranda.

ARS encompass a broad range of bonds with different characteristics. They have been issued by a variety of corporations and other entities, including (i) closed-end preferred funds, (ii) states, state agencies, municipalities, and other government authorities, and (iii) public and private student-loan originators and lenders. (*Id.* ¶ 31.) And there are a multitude of assets that back different types of ARS, from student loans, to high-quality mortgages, to subprime mortgages. Thus, rating agencies gave ARS different ratings depending on the credit quality of the issuer and of the asset pool securitizing the particular security's income stream. For example, Lead Plaintiff Hamm invested in ARS that received a AAA rating because they were collateralized by government-backed student loans. (*Id.*, Anderson Cert. Attachment A; Request for Judicial Notice ("RJN") Ex. 1 at 44.)

ARS were sold at different auctions managed by different auction agents. At the auctions, investors would place simultaneous bids to buy, sell, or hold a particular ARS at a given interest rate. (SAC ¶ 34.) If there were sufficient buyers to cover all the offers to sell, the auction agent would then set the uniform "clearing rate," or the lowest rate at which all ARS sellers could find willing buyers. (*Id.* ¶ 37.) If there were not enough buyers for all available securities, the auction would fail. (*Id.*) But a failure was not a default—the security paid a guaranteed interest rate defined by the security's offering memorandum. (*Id.* ¶ 38.) Rather, an auction failure meant that the ARS holder would not have the opportunity to sell its ARS until the next periodic auction. (*Id.*)

Broker-dealers like BofA played several roles in ARS auctions. They could act (i) on the issuer's behalf by structuring and underwriting ARS issuances and managing ARS auctions (*id.* ¶¶ 40-41), (ii) on investors' behalf by soliciting, receiving, and placing ARS orders (*id.* ¶ 40), and (iii) on their own behalf by placing ARS orders for their own accounts (*id.* ¶¶ 44-47). These various roles were neither secret nor unusual. For example, in March 2005, after major accounting firms decided that ARS were not "cash equivalents" (*id.* ¶ 58), the *Wall Street Journal* reported that ARS were distinct from true short-term investments because "investors rely on the broker-dealers who conduct the auctions to provide liquidity." (RJN Ex. 2.) And the SEC publicly reported in 2006 that numerous ARS broker-dealers, including BofA, underwrote ARS, managed auctions, and "intervened in auctions by bidding for their proprietary accounts. . . ." (RJN Ex. 3, at 3-6.) The SEC acknowledged that broker-dealers were not prohibited from acting in these various roles. *See id.* at 6 n.6 ("This Order does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed.").

Following the SEC's 2006 order, BofA and other broker-dealers publicly disclosed their various auction roles in documents that remain on their websites to this day. (SAC ¶ 116; *see, e.g.*, RJN Exs. 4 & 5.) BAS, for example, disclosed potential conflicts that could arise from its roles on both sides of ARS auctions:

> [i]n connection with any issue of auction rate securities, BAS may serve as underwriter and/or broker-dealer and may also purchase auction rate securities for its own account. Given these various roles, for any given auction, BAS may have different or conflicting interests (i.e. . . . an interest in a lower clearing rate to benefit its issuer or obligated party client; or an interest in a higher clearing rate to benefit its investing customers or itself as investor).

(RJN Ex. 4 at 3; *see also* RJN Ex. 5 at 4-5.) BAS disclosed that it "routinely" participated in auctions for its own account: "BAS is permitted, but is not obligated, to submit orders for its own account either as a bidder or as a seller, and *routinely does so in its sole discretion*." (RJN Ex. 4 at 1; *see also* RJN Ex. 5 at 15-16.) The disclosures informed investors that BAS's bidding was "likely" to affect auction results because:

> - the auction clearing rate is likely to be higher or lower than the clearing rate that would have prevailed if BAS had not bid, including preventing the clearing rate from becoming the

> "Maximum Rate" (as described below); and/or
>
> - the allocation of securities is likely to be affected, including the displacement of prospective holders who may have their bids rejected or receive fewer securities than they would have received if BAS had not bid.

(RJN Ex. 4 at 1; *see also* RJN Ex. 5 at 16.)

Although auctions had proceeded without significant failures since ARS were first sold in 1984 (SAC ¶ 32), BAS disclosed on its website the possibility that an auction could fail:

> If the total par amount of sell orders received by the Auction Agent exceeds the total par amount of bids at rates lower than the Maximum Rate received by the Auction Agent for the Auction Rate Securities being auctioned, the auction is said to be a "Failed Auction."

(RJN Ex. 4 at 2; *see also* RJN Ex. 5 at 11.) BAS further cautioned that if an auction were to fail, customers would not be able to sell their ARS:

> As a result, holders of such auction rate securities that submitted sell orders are not able to sell their securities in that auction, and the interest rate for the next interest rate period defaults to a pre-defined "Maximum Rate", as specified in the program documents for the particular security. . . . This rate is designed to compensate holders for the *loss of liquidity* resulting from a Failed Auction . . . . Although the Maximum Rate is generally above a market rate, *holders may be disadvantaged if there is a Failed Auction because they are not able to exit their positions* by means of the Auction.

(RJN Ex. 4 at 2; *see also* RJN Ex. 5 at 11, 18.) BAS told its customers that it would try—but had no obligation—to prevent auction failures by intervening for its own account: "Such bids submitted by BAS may be designed to prevent a Failed Auction . . . however, BAS is not obligated to place such a bid in any auction, or to continue to place such bids." (RJN Ex. 4 at 1; *see also* RJN Ex. 5 at 15-16.)

BAS directed ARS customers, including Lead Plaintiff Hamm, to these disclosures in trade confirmations, which stated that "BAS' Auction Rate Securities Procedures are available at www.bofa.com/auctionpractices." (*See, e.g.*, RJN Ex. 6.) The website disclosures supplemented those in prospectuses and registration statements for various ARS that were sold to the public. For example, the prospectus for Panhandle-Plains Higher Education Authority, Inc. Student Loan Revenue Bonds Series 2007, which Lead Plaintiff Hamm allegedly purchased (*see* SAC

Anderson Cert. Attachment A at 4), also warned investors about BAS's role in auctions and the risk of auction failure:

> BAS *routinely places bids in auctions generally for its own account to acquire securities for its inventory, to prevent an "Auction Failure"* (which occurs if there are insufficient clearing bids and results in the auction rate being set at the maximum rate) *or to prevent an auction from clearing at a rate that the Broker-Dealer believes does not reflect the market for such securities*. The Broker-Dealer may place one or more Bids in an Auction for the Taxable Series 2007 Bonds for its own account to acquire the Taxable Series 2007 Bonds for its inventory, *to prevent an Auction Failure or to prevent Auctions for the Taxable Series 2007 Bonds from clearing at a rate that the Broker-Dealer believes does not reflect the market for the Taxable Series 2007 Bonds*. The Broker Dealer may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it.

(RJN Ex. 1 at 13.)

The risks of which BAS had warned—failed auctions and illiquidity—came to pass in late 2007 and early 2008. As the credit crisis seized the mortgage market in 2007 (SAC ¶ 68), some auctions of ARS backed by subprime-mortgage assets began to fail. By February 2008, the panic deepened and spread beyond ARS backed by the riskiest subprime collateral, as other auctions of ARS backed by different asset classes began to fail. (*Id.* ¶ 95.) On February 13, 2008, nearly 90% of ARS auctions failed. (*Id.* ¶ 70.) The economic crisis deepened significantly thereafter, leaving few, if any, willing buyers in ARS auctions, although many ARS investors continue to receive interest on their investment. (*Id.* ¶¶ 38, 72.)

## ARGUMENT

### I. THE SECTION 10(b) CLAIMS (COUNTS I AND III) SHOULD BE DISMISSED.

The SAC asserts Section 10(b) claims on behalf of a Class of ARS investors, some of whom never communicated with BofA, and others who never purchased so-called "BA ARS"[3] during the class period between May 22, 2003, and February 13, 2008. (SAC ¶¶ 2, 18.) The Class consists of:

- Purchasers, like O'Gara, who never bought ARS from BofA (*see id.* ¶ 12), but allege

[3] The SAC defines "BA ARS" as "auction rate securities for which BAS served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer." (SAC ¶ 18; *see also id.* ¶ 2.)

nonetheless (in Count I) that BofA manipulated the "market for BA ARS" by "maintaining a policy of placing or causing the placement of support bids in every auction for [BA ARS] to the extent necessary to create the appearance of stability and liquidity in the auction market, prevent auction failures, and set the rates of interest or dividends paid on those securities." (*Id.* ¶ 5; *see also id.* ¶¶ 146-161.)

- Investors, like Hamm, who purchased *any* "auction rate securities from BAS or BAIS" (*id.* ¶ 18), and allege that BofA misrepresented and failed to disclose facts and risks about ARS' liquidity and BofA's role and interests in ARS auctions (Count III). (*Id.* ¶¶ 4-5, 170-206.)

Both claims fail because the SAC fails to meet Rule 9(b)'s and the PSLRA's heightened pleading requirements. It does not adequately plead (i) manipulative acts or misrepresentations; (ii) that BofA acted with the intent to deceive, manipulate, or defraud; (iii) that the Class relied on BofA's conduct or statements; or (iv) that BofA's conduct or statements, rather than a market-wide collapse, caused any alleged loss.

**A. The SAC does not plead fraud with particularity (Counts I and III).**

1. The Class does not plead manipulative conduct with particularity (Count I).

Section 10(b) market-manipulation claims must satisfy Rule 9(b), which requires plaintiffs to allege with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient."). The SAC supplies none of the factual detail that Rule 9(b) requires, such as (i) who manipulated what market, (ii) when the manipulation occurred, and (iii) how the manipulation was accomplished.

a. *The SAC does not specify who perpetrated the allegedly manipulative acts.*

Rule 9(b) requires a plaintiff to "distinguish among those he sues and enlighten each

defendant as to his or her part in the alleged fraud." *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1432 (N.D. Cal. 1988). Here, the SAC does not identify a single BofA representative who committed the allegedly manipulative acts. Its reference only to unspecified "senior management" (SAC ¶ 137) is precisely the generalized allegation that Rule 9(b) prohibits. *See Segal Co. (E. States), Inc. v. Amazon.com*, 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003) ("[T]he complaint's reference to certain 'representatives' of defendant is too vague to sufficiently identify the alleged perpetrators."). And the SAC fails to differentiate among the BofA defendants, lumping them all together throughout as "Bank of America," "Defendants," or "BAS and BAIS." (*See* SAC ¶¶ 17, 42-43, 57, 59, 92, 96; *id.* at 9:18 ("Bank of America Engaged In A Scheme To Defraud Purchasers Of Auction Rate Securities.").) This, too, warrants dismissal. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.").

b. *The SAC does not particularize when the alleged manipulation occurred.*

Rule 9(b) requires a plaintiff to specify when the allegedly manipulative acts occurred. *See, e.g., United States v. SmithKline Beecham Clinical Labs.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (holding that complaint with no dates or times failed under Rule 9(b)). But the SAC only alleges generally that manipulation occurred sometime during a five-year period. (*See, e.g.*, SAC ¶¶ 2, 18 (alleging that "Class Period" spans from May 22, 2003, through February 13, 2008)). This pleading failure also warrants dismissal. *See Moore*, 885 F.2d at 541 (rejecting allegation that fraud "[c]ommenc[ed] on or about October, 1982, and through and including March, 1983"); *see also Segal Co. (E. States), Inc.*, 280 F. Supp. 2d at 1231 (rejecting allegation that misrepresentations occurred over "several weeks").

c. *The SAC does not allege what acts were manipulative or how the alleged manipulation occurred.*

A complaint must cite specific conduct or statements to satisfy Rule 9(b). *See Segal Co. (E. States), Inc.*, 280 F. Supp. 2d at 1231 (citing cases holding that "specificity requirement not

met without specific references to conduct or statements made by defendant"). The prolix SAC recites only generalized and conclusory allegations that BofA deceptively (i) underwrote ARS "with maximum rates that were capped at insufficient levels" (SAC ¶ 41; *see also id.* ¶¶ 84-87); (ii) "followed a uniform policy of placing support bids, if needed to prevent auction failures, in every auction for which it was sole or lead auction dealer" (*id.* ¶ 46; *see also id.* ¶¶ 5, 44-45, 47-51); and (iii) "set," "managed," "assert[ed] control over," and "rigg[ed]" ARS interest rates and auction clearing rates (*id.* ¶¶ 5, 51-54, 80, 135). Yet, nowhere does the SAC (i) identify a single security that had its "maximum rate[] . . . capped at insufficient levels" (let alone explain why that level was insufficient); (ii) list a single auction in which BofA intervened (let alone describe the allegedly "uniform policy" that BofA had to intervene in "every auction" or even articulate why intervening in auctions is improper); or (iii) provide a single interest rate or clearing rate that BofA "rigg[ed]" (let alone explain how the "rigging" occurred or anyone was misled).

In fact, BofA disclosed its role and participation in ARS auctions (and the potential effect on ARS' liquidity and clearing rates), which precludes any claim that BofA secretly manipulated some monolithic ARS "market" that did not exist. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (holding that allegedly unfair but disclosed conduct cannot state market-manipulation claim under Section 10(b) and Rule 10b-5); *ATSI Commc'ns*, 493 F.3d at 101 (deeming securities not manipulative "so long as their terms are fully disclosed"); *Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982) (observing that conduct is not manipulative where its nature and surrounding facts were disclosed). Contrary to the SAC's allegation that BofA "suggested" it intervened "only sporadically" (SAC ¶ 66), BofA disclosed on its website that it "routinely" "submit[ted] orders for its own account, either as a bidder or as a seller," potentially to sustain an auction that might otherwise fail. (RJN Ex. 4 at 1.) The *Wall Street Journal* reported about such broker-dealer participation as early as 2005 (RJN Ex. 2), and the SEC specifically recognized in 2006 that such participation was not prohibited "when properly disclosed." (RJN Ex. 3 at 6 n.6.) And BofA's disclosures (along with many others in many ARS' publicly available prospectuses), were available to any investor through the Internet. Thus, the SAC does not, and cannot, particularize any manipulative or deceptive conduct.

2. The SAC fails to particularize misleading statements to investors who purchased ARS directly from BofA (Count III).

A securities-fraud complaint cannot survive under the PSLRA unless it "specif[ies] each misleading statement" that the defendants allegedly made. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006); *see* 15 U.S.C. § 78u-4(b)(1). Similarly, Rule 9(b) requires a complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. [A] plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.") (emphasis in original).

This is not the typical Rule 10b-5 class action in which plaintiffs challenge a company's public statements to an efficient market. Rather, it involves an aggregation of individualized customer claims that are necessarily premised on statements made by hundreds of BofA account representatives to *each specific customer* in innumerable conversations over nearly five years. The SAC does not—nor could it possibly—describe each statement, who made it, and when and where it was made, as Rule 9(b) and the PSLRA require. Instead, it (i) recounts statements about ARS made to *one* BofA customer, Lead Plaintiff Hamm, by its BofA sales representatives (SAC ¶¶ 172-177); and then (ii) tries to parlay those individualized conversations into representations made to all investors who purchased ARS directly from BofA through the conclusory allegation that BofA used "uniform, standardized and materially identical sales pitches" (*id.* ¶ 190; *see also id.* ¶¶ 57, 188). This pleading trick fails, because the SAC contains no particularized facts showing that a "standardized sales pitch" even existed, much less that *every* BofA account representative recited it without material deviation to *every* ARS customer. *See* 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*."); *Cal. Pub.*

*Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("[S]tatements that are attributed to no source and are based on nothing more than speculation . . . are undisputedly insufficient to satisfy the [PSLRA's] heightened pleading standard."); *In re Harmonic Sec. Litig.*, 163 F. Supp. 2d 1079, 1094 (N.D. Cal. 2001) (dismissing Section 10(b) claim because "for any matter that is plead on information and belief, plaintiffs are required to state with particularity all facts on which such belief is formed").

Moreover, BofA's written materials refute the allegation that BofA misrepresented ARS' characteristics and risks even to Lead Plaintiff Hamm. BAS directed Hamm to its "Material Auction Practices and Procedures," for example, which the Court can consider on this motion. (*See* RJN at 3; RJN Ex. 4.) Those website disclosures squarely counter the SAC's allegations that BofA misrepresented ARS' liquidity and failed to disclose the risk of failed auctions, as the following excerpt from the chart attached at Tab 1 illustrates:

| **Alleged Misrepresentations to Hamm** | **Website Disclosures in Exhibit 4 to the Request for Judicial Notice** |
|---|---|
| "Mr. Glidden contacted Mr. Anderson in January 2006 and advised him to purchase auction rate securities, which Mr. Glidden described as being *cash equivalent instruments that were an alternative to money market funds*." (SAC ¶ 172.)<br><br>"Mr. Glidden and Mr. Dobkins assured Mr. Anderson that auction rate securities were low-risk investments, that the investments could be liquidated every 7 to 28 days, making them *cash equivalents*, and that they had *virtually no default or liquidity risk*." (SAC ¶ 175.) | "If the total par amount of sell orders received by the Auction Agent exceeds the total par amount of bids at rates lower than the Maximum Rate received by the Auction Agent for the Auction Rate Securities being auctioned, *the auction is said to be a 'Failed Auction.'* As a result, holders of such auction rate securities that submitted sell orders are *not able to sell their securities* in that auction, and the interest rate for the next interest rate period defaults to a pre-defined 'Maximum Rate' . . . . This rate is designed to compensate holders for the *loss of liquidity* resulting from a Failed Auction . . . . Although the Maximum Rate is generally above a market rate, *Holders may be disadvantaged if there is a Failed Auction because they are not able to exit their positions* by means of the Auction." (RJN Ex. 4 at 2.)<br><br>"[T]here can be *no assurance* that a secondary market for auction rate securities will develop, or if it does develop, that it will provide existing holders *the ability to resell the securities in the secondary market on the terms or at the times desired by the holder*." (RJN Ex. 4 at 3.) |

In view of these disclosures, the BofA representatives' alleged statements could not have been misleading, as the SAC contends. *See In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06 CV228, 2009 U.S. Dist. LEXIS 22022, at *28 (S.D. Cal. Mar. 18, 2009) ("Plaintiffs have not explained why a warning that addresses in detail the precise risk which comes to pass, even if that warning is simply 'boilerplate,' is insufficient."); *Woods v. Asset Res.*, No. 06 cv 398, 2006 U.S. Dist.

LEXIS 94325, at *6-7 (E.D. Cal. Dec. 21, 2006) ("When a written instrument or subject of judicial notice contradicts allegations in a complaint to which it is attached, the Court need not accept the allegations of the complaint as true."). Indeed, if any BofA representations were "uniform" or "standardized," it was the written disclosures of the ARS characteristics and risks that BofA allegedly concealed.

Unable to particularize any "standardized and materially identical sales pitches" as the PSLRA and Rule 9(b) require, the SAC alleges that *all* BAS and BAIS brokers acted "[p]ursuant to management directives" in failing to disclose certain material facts about ARS. (SAC ¶¶ 59-61.) These vague allegations likewise fail Rule 9(b)'s heightened pleading requirements. *See, e.g.*, *Seattle Pacific Indus., Inc. v. Melmarc Prods., Inc.*, No. C 06-834, 2007 U.S. Dist. LEXIS 7547, at *6 (W.D. Wa. Jan. 31, 2007) (holding that allegations against "authorized agents" do not satisfy Rule 9(b)); *Segal Co. (E. States), Inc.*, 280 F. Supp. 2d at 1231 (dismissing allegations against "'certain' representatives" under Rule 9(b)). As another Northern District of California court recently held in dismissing an investor's ARS-related fraud claims against Lehman Brothers:

> [T]he complaint only generally alleges that these defendants, because of their senior positions at Lehman . . . possessed the power and authority to control Lehman's reports, presentations, and investment and portfolio recommendations . . . including in particular the types of statements alleged herein that Lehman representatives and employees made concerning the risk and liquidity of ARS. These and similar allegations about what "defendants and Lehman" knew or did are insufficient.

*Openwave Sys. Inc. v. Fuld*, No. C 08-5683, 2009 U.S. Dist. LEXIS 48206, at *14 (N.D. Cal. June 6, 2009). Accordingly, Count III should be dismissed.

**B. The SAC's factual allegations do not give rise to a "strong inference" that BofA acted with scienter (Counts I and III).**

As this Court has recognized, "[t]he heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead 'fraud by hindsight.'" *In re Ditech Commc'ns Corp. Sec. Litig.*, No. C 05-2406, 2007 U.S. Dist. LEXIS 78411, at *15 (N.D. Cal. Oct. 11, 2007) (White, J.) (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)). A

Section 10(b) complaint must therefore "state with particularity facts giving rise to a *strong* inference that the defendant acted with" scienter, or the intent to deceive, manipulate, or defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). An inference of fraudulent intent is not "strong" unless it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*; *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."). A complaint can meet that standard only by alleging, "in *great* detail, facts that constitute *strong* circumstantial evidence" that defendants *deliberately* or *consciously* concealed the truth. *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *see Glenbrook Capital Ltd. P'ship v. Kuo*, No. C 07-2377, 2009 U.S. Dist. LEXIS 30745, at *33-34 (N.D. Cal. Mar. 30, 2009) (White, J.) ("[T]o establish the requisite scienter, the SAC must support the strong inference that Defendants acted deliberately reckless by making a highly unreasonable omission that is an extreme departure from the standards of ordinary care."). The SAC's generalized allegations do not satisfy this rigorous standard.

1. The SAC does not identify who committed the alleged fraud.

A corporate entity cannot act with scienter unless its representatives act with scienter. *See, e.g.*, *McCasland v. Formfactor Inc.*, No. C 07-5545, 2008 U.S. Dist. LEXIS 60544, at *23 (N.D. Cal. July 25, 2008) ("[A] corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time of the statement."); *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-2544, 2008 U.S. Dist. LEXIS 44872, at *66-67 (C.D. Cal. May 23, 2008) (same) (quoting *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)).

The SAC does not, however, identify a single BofA representative who had the requisite intent to defraud. (SAC ¶¶ 59-61 (referring to unspecified "management directives"); ¶¶ 137, 190 (referring to unspecified "senior management").) In fact, the SAC fails to differentiate even

among the BofA entities it sues, instead impermissibly lumping them together as "Bank of America," "Defendants," or "BAS and BAIS." (*See* SAC ¶¶ 17, 42-43, 57, 59, 92, 96; *id.* at 9:18.) *See, e.g., Int'l Rectifier*, 2008 U.S. Dist. LEXIS 44872, at *39 n.9 (rejecting plaintiffs' attempt to "lump all of the defendants and all of the alleged fraudulent practices and accounting errors together" to plead scienter); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1351-52 (S.D. Cal. 1998) (dismissing Section 10(b) complaint that "lump[ed] all defendants together by conclusory allegations" because "scienter must be pled as to each defendant"). And the SAC admits that the only individuals it identifies—Hamm's BofA account representatives—*had no knowledge* of the alleged fraudulent scheme. (*See* SAC ¶ 62 (alleging that "Defendants' brokers . . . had not been provided with" the alleged truth); *id.* ¶ 63 ("Defendants' brokers lacked a rudimentary understanding about auction rate securities, including BA ARS, and how the auction rate securities market functioned during the Class Period.").) This is the antithesis of the particularized fraud pleading that the PSLRA requires.

Nor can the account representatives' alleged misstatements support an inference that any BofA entity possessed fraudulent intent. The Ninth Circuit has hypothesized in *dicta* that "there could be circumstances in which a *company's* public statements were so important and so dramatically false that they would create a strong inference" that someone at the corporation knew the statement was false. *Glazer Capital Mgmt., LP*, 549 F.3d at 744 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). But the Ninth Circuit declined to adopt that potential exception, which in any event would not apply here because the SAC does not allege that "the company" made any public misstatements—only anecdotal oral statements by individual brokers who the SAC admits had no fraudulent intent.

2. The SAC fails to particularize facts constituting strong circumstantial evidence of intentional or conscious misconduct.

The SAC does not allege any facts directly demonstrating that any BofA representative acted with the intent to defraud. Instead, it tries to infer such intent through five generalized, unrelated allegations, none of which shows that any BofA representative knew that nearly all ARS auctions would fail in February 2008.

            a.      *Generalized references to "senior management" are inadequate.*

Allegations about an individual's corporate position cannot themselves support a strong scienter inference.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158-59 (C.D. Cal. 2007) (collecting cases and holding that "the high rank of various Individual Defendants . . . is insufficient, without more, to infer a strong inference of scienter"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174-75 (C.D. Cal. 2007) (same).  Rather, such allegations must be accompanied by particularized facts supporting an inference that the individual contemporaneously knew the alleged truth.  *See Zucco Partners, LLC*, 552 F.3d at 1000-01 (allegations that management closely analyzed manipulated accounting numbers "do not support the inference that management was in a position to know that such data was being manipulated"); *Hansen Natural Corp.*, 527 F. Supp. 2d at 1159 (refusing to infer scienter from allegations that defendants merely had "access to . . . undisclosed information and internal conversations"); *see also In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1184 (N.D. Cal. 2004) (White, J.) ("In the absence of specifics, a court cannot determine whether there is any basis for alleging that the defendants knew that their statements were false *at the time they were made*.").

The SAC's unadorned reference to "senior management" therefore fails.  (SAC ¶¶ 137, 190.)  Plaintiffs do not explain how these "senior" managers were in a position to know BofA's ARS practices, much less how they knew that those practices concealed that all ARS auctions run by all broker-dealers were on the verge of long-term failures.  *See, e.g.*, *Brodsky v. Yahoo! Inc.*, No. C 08-2150, 2009 U.S. Dist. LEXIS 51281, at *27 (N.D. Cal. June 18, 2009) (dismissing with prejudice complaint alleging that defendants "must have known about problems" based on their "high level positions in the company"); *Bennett v. H&R Block Fin. Advisors, Inc.*, No. C 04-4848 MHP, slip op. at 10 (N.D. Cal. June 1, 2005) ("*Bennett I*") (attached at Tab 2) (dismissing Rule 10b-5 complaint because "plaintiffs have done nothing to raise an inference of internal knowledge other than the conclusory allegation that it is so").

b. *The SAC's reference to a lone presentation is inconclusive.*

A complaint relying on documents to support a strong scienter inference "must allege *specific documents* exhibiting internal knowledge, as well as 'detail[ing] with particularity the content of such data'" and "such facts as may indicate [the documents'] reliability." *Bennett I* at 10 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002); *see Silicon Graphics, Inc.*, 183 F.3d at 985. Even with those particulars, however, reliance on a single document will not suffice absent other strong circumstantial evidence. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) ("[A] plaintiff cannot avoid dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations."); *Bennett I* at 11 ("[T]he single specific allegation of insider insight in the complaint . . . cannot support a host of allegations that defendant knew that the [bonds] were high-risk and disadvantageous instruments.").

The SAC cannot support a strong scienter inference because it cites but a single document purportedly showing BofA's internal knowledge that ARS auctions were "unsustainable." (SAC ¶ 92.) It alleges that BofA created a December 17, 2007 presentation to warn the State of California, a municipal ARS issuer, about "significant dislocation" in ARS auctions, which had allegedly left BofA with "much higher" ARS inventory. (SAC ¶ 92.) Even if this lone document could overcome the SAC's other deficient allegations, nowhere does the SAC allege particularized facts that indicate the document's reliability, such as (i) who prepared it, (ii) based on what sources, and (iii) whether it was in fact delivered. And in any event, certain employees' knowledge of "significant dislocation" does not equate to knowledge that all ARS auctions would fail less than two months later. *See Morgan v. AXT, Inc.*, No. C 05-5106, 2005 U.S. Dist. LEXIS 42346, at *37 (N.D. Cal. Sept. 23, 2005) (defendants' knowledge that large customer canceled its orders because of non-conforming products did not support strong inference that defendants "knew that the non-conforming . . . shipments were part of a *widespread* quality problem with [the] products"). To the contrary, the SAC's excerpts from the presentation reveal that BofA did *not* know what would happen to future ARS auctions: the presentation mentions "significant *uncertainty*" about ARS pricing and concludes that "[i]t is *not clear* whether investor demand will

return in the size required to achieve previous pricing levels." (SAC ¶ 92.) And because BofA allegedly created this presentation for a *municipal* ARS issuer, it does not support any inference about other unrelated ARS segments, such as student-loan-backed ARS, which the SAC does not allege had at that time ever experienced an auction failure.

c. *Allegations that BofA sold its ARS inventory merely describe a routine business operation.*

"[M]ere generalized assertions about routine business objectives" cannot alone support a strong scienter inference. *Zucco Partners, LLC*, 552 F.3d at 1006; *see also Metzler Inv. GMBH*, 540 F.3d at 1069 (refusing to infer scienter when defendant's statement "is equally susceptible to an interpretation . . . that [defendant] was simply making a broader exhortation to improve business"); *Int'l Rectifier*, 2008 U.S. Dist. LEXIS 44872, at *54 ("[T]here are many legitimate business reasons for an increase in sales . . . ."). In *Bennett*, for example, plaintiffs alleged that H&R Block's broker-dealer arm had concealed information about Enron's emerging financial crisis and incentivized its brokers to sell its Enron-bond inventory before the company declared bankruptcy. *See Bennett I* at 2, 10. Judge Patel concluded that these special-incentives allegations showed merely that H&R Block wanted to "enhance [its] business prospects," not that it possessed fraudulent intent. *Id.* at 11; *see also id.* ("[I]t would be folly for this court to hold that incentives for brokers to sell securities provide a basis for inferring intent to defraud.").

Similarly here, the SAC cannot plead scienter through vague, generalized allegations that BofA "knew that the auction rate securities market was unsustainable," leading it to "pressure[]" its brokers in an "aggressive campaign" to sell its own ARS inventory. (SAC ¶¶ 89, 91-92; *see also id.* ¶ 137.) The SAC supplies no facts to show that BofA's alleged "campaign" actually existed or, if it did, that it was anything other than a routine business plan. There is no allegation about the campaign's origin, participants, extent, duration, how it differed from BofA's standard inventory-sales practices, or whether it was even successful. As in *Bennett*, therefore, the SAC's inventory allegations cannot support a strong inference that any BofA representative acted with fraudulent intent.

d. *BofA's alleged efforts to influence ARS issuers' credit ratings do not provide a strong inference of scienter.*

Equally vague is the SAC's allegation that BAS "understood that it could obtain AAA ratings for the auction rate securities they underwrote only if those securities carried low maximum rates." (SAC ¶ 85; *see also id.* ¶ 87 (alleging that BAS "knew that those [AAA] ratings actually reflected the limited liquidity of BA ARS in the form of low maximum rates").) The SAC does not contain a single particularized fact about (i) how BAS "obtain[ed]" AAA ratings for securities it underwrote, (ii) how a low maximum rate, as opposed to other factors, affected a credit rating; (iii) why the government's guarantee of the underlying student-loan collateral did not independently merit AAA ratings for the SLARS that BAS underwrote; (iv) which issuers were affected; (v) what ARS offerings were targeted; and most significantly (vi) whether any particular security's rating was actually affected (let alone misrepresented).

Even if the SAC were to provide such detail, allegations that BofA influenced securities' credit ratings still would not support a strong inference that BofA manipulated auctions or misled customers about whether auctions would fail. Credit ratings gauge *credit* or repayment risk, not *market* or liquidity risk. *See, e.g., J&R Mktg., SEP v. Gen'l Motors Corp.*, No. 06-10201, 2007 U.S. Dist. LEXIS 13227, at *7 (E.D. Mich. Feb. 27, 2007) ("[Credit rating] agencies issue recommendations that are based upon investigative underwriting of *a particular issuer's credit quality*."). The SAC does not allege that BofA intended any particular ARS issuance to receive a credit rating that did not accurately reflect its credit "quality and safety." (SAC ¶ 87.) It merely alleges generally—and in hindsight—that low maximum interest rates limited the ARS' liquidity after failed auctions (*Id.* ¶ 86), without a single particularized fact showing BofA's knowledge that this would facilitate serial failures of auctions for $300 billion worth of all types of ARS for the first time in 23 years.

e. *The SAC's references to regulatory investigations are insufficient.*

The SAC's allegations about regulatory investigations and settlements are no substitute for particularized facts. The SAC first cites SEC findings for conduct through June 30, 2004—nearly four years before the SAC's Class Period ended. (*Id.* ¶ 115.) Those findings thus cannot

support an inference about BofA's knowledge during the period at issue here. The SAC then seeks to rely on allegations that the SEC made after the February 2008 auction failures. (*Id.* ¶ 120.) But "unadjudicated administrative filings" cannot supply the particularized facts that the PSLRA requires. *Bennett I* at 6-7; *see also In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401, 2005 U.S. Dist. LEXIS 20215, at *19 (N.D. Cal. July 27, 2005) ("It is generally accepted that allegations of violations of GAAP or SEC regulations, without more do not establish scienter."). The SAC's reference to BofA's October 2008 settlement with the SEC (SAC ¶ 123) fares no better, because merely settling a regulatory investigation does not create a strong inference of fraudulent intent. *See, e.g.*, *Glazer Capital Mgmt.*, 549 F.3d at 748 (holding that regulatory settlement agreements did not substitute for "particularized facts giving rise to a strong inference of scienter").

3. The SAC's allegations as a whole do not give rise to a strong scienter inference.

After considering a complaint's scienter allegations individually, this Court should also consider whether "the totality of circumstances" nonetheless raises a strong inference of scienter. *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). This entails "a holistic review" to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness. *Id.* "Even if a set of allegations" creates an inference that is "greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners, LLC*, 552 F.3d at 1006.

In evaluating this inference, courts can consider allegations that cannot themselves support a strong scienter inference, such as allegations that a defendant had the motive and opportunity to commit fraud. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) ("Even considered holistically, under *Tellabs*, these motive allegations cannot support a strong inference of scienter."). But the SAC's allegations that BofA had a motive to commit fraud are just as inadequate.

First, BofA's "typical" fees from ARS issuers (SAC ¶¶ 73-76) "are hardly indicative of scienter." *Rubke*, 551 F.3d at 1166 (rejecting allegations regarding defendant's profit motive);

*see also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 n.1 (S.D.N.Y. 2008) (finding allegations that defendants earned fees insufficient to plead motive). And the SAC's allegations about what "issuers *typically* paid" BofA (SAC ¶¶ 74, 76) are not particularized because they do not (i) identify any specific fees that BofA earned for underwriting an ARS offering or managing an auction; (ii) allege that BofA earned any such fees with knowledge that all ARS auctions were about to fail; (iii) explain how earning those fees was worth BofA holding $2.8 billion of allegedly risky ARS in its own account (*see id.* ¶ 110); or (iv) describe how those fees were "typical" of BofA's engagements with ARS issuers.

Second, the SAC fails to particularize facts supporting its vague allegation that BofA was motivated to advance a "common interest" with other broker-dealers. Its assertion that BofA had an unspecified "tacit or express understanding" with unspecified "other auction dealers" (SAC ¶¶ 97-98) is pure speculation that the SAC does not support with a single example of BAS "monitor[ing] the actions of its competitors" or "communicat[ing] directly" with any of them. (*Id.* ¶ 98.) *See, e.g.*, *Lory v. Ryan*, No. CV 07-2174, 2008 U.S. Dist. LEXIS 84478, at *11 (D. Ariz. Oct. 20, 2008) (speculative motive allegation insufficient). And the allegation would fail even if it were supported, because no inference of scienter applies to allegations that a company was "motivated by concerns that are shared by *all* companies." *In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C 05-0295, 2006 U.S. Dist. LEXIS 14790, at *54-55 (N.D. Cal. Mar. 10, 2006).

Third, the SAC's conclusory allegation that BofA "expected to and did benefit from the anticipated collapse of the [ARS] market" (SAC ¶ 96) is inconsistent with its allegations that BofA (i) earned significant fees from ARS, and (ii) recorded a $216 million *loss* after auctions failed in the first quarter of 2008 (*id.* ¶ 110). In that regard, the SAC lacks any particularized facts showing that BofA believed it would earn more money—through underwriting fees and margin loans—if ARS auctions were to fail. Nor is such an inference plausible, because it begs the question why broker-dealers supported ARS auctions for years. *See McCasland v. FormFactor Inc.*, No. C 07-5545, 2009 U.S. Dist. LEXIS 59996, at *22-23 (N.D. Cal. July 14, 2009) (finding no strong inference of scienter where "facts are inconsistent with plaintiffs' theory of fraud").

In view of these deficient motive allegations, the SAC's vague allegations that BofA had "The Opportunity to Manipulate The Market For BA ARS" prove nothing. (SAC at 17:1, ¶¶ 77-83.) The circumstances surrounding this "opportunity," which arose because BAS allegedly "exercised near complete control over information associated with auctions" (*id.* ¶ 81), were in fact disclosed to investors: "BAS is likely to have an advantage over other bidders in that it would have knowledge of some or all other orders placed through it in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the auction is likely to clear at a particular rate." (RJN Ex. 4 at 1.) *See In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06CV228, 2008 U.S. Dist. LEXIS 88791, at *24 (S.D. Cal. Sept. 2, 2008) ("Disclosing the precise risks at issue 'negate[s] an inference of scienter.'") (quoting *Wet Seal*, 518 F. Supp. 2d at 1165). BofA's purported information advantage also allegedly stemmed from its knowledge that "the number of buyers for BA ARS was becoming increasingly saturated" and the effect of "adverse trends in the credit markets or unfavorable news about BA ARS." (SAC ¶ 82.) Such unparticularized allegations cannot withstand the PSLRA's heightened scrutiny.

After considering the "totality" of the SAC's inadequate allegations, the far more compelling inference is that BA ARS were a casualty of an unprecedented global financial crisis. Along those lines, one Central District of California court recently dismissed with prejudice a Section 10(b) claim against a lender upended, like BofA and other financial institutions, by the economic crisis. The court held that plaintiffs' inadequate scienter allegations merely depicted "a company involved in a volatile industry at the onset of a long, destructive economic downturn." *Pittleman v. Impac Mortgage Holdings, Inc.*, No. CV 07-970, 2009 U.S. Dist. LEXIS 18213, at *10 (C.D. Cal. Mar. 9, 2009). This case is no different. The SAC alleges no particularized, contemporaneous facts—nor could it—to show that BofA masterminded a $300 billion market-wide collapse, the likes of which had never occurred. Not only is that fanciful theory not "cogent" or "compelling" (as the PSLRA and Rule 9(b) require)—it's not even "plausible or reasonable" (Rule 8's less stringent pleading requirement). *Tellabs*, 551 U.S. at 314.

### C. The SAC does not plead reliance (Counts I and III).

To state a Section 10(b) claim, plaintiffs must allege that they would not have purchased the securities but for the defendants' allegedly fraudulent conduct. *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999). The SAC establishes no grounds to presume each Class member's reliance on BofA's alleged conduct or statements here.

#### 1. The Class cannot obtain a presumption of reliance based on conclusory allegations of "standardized sales pitches."

As described above, the SAC provides no particularized facts to support its conclusory assertion that all BofA ARS customers received a "standardized sales pitch." *See supra* at 8. It therefore supplies no basis to presume the Class's reliance on BofA's statements. *See Bennett I* at 8 ("If . . . the allegations at the heart of this case concern point-of-sale conversations as opposed to uniform sales presentations, then this case may not be properly characterized as a Section 10(b) class action."); *see also In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 320 (S.D.N.Y. 2004) ("Where the claim stated cannot *by its nature* form the basis of a class action, . . . it is appropriate to dismiss the claim as to the purported class under Rule 12(b)(6).") (alteration in original). Nor does the SAC describe the innumerable conversations between certain putative Class members and their respective BofA account representatives. Instead, it offers only Hamm's unique interactions with its BofA account representatives (SAC ¶¶ 171-77), which cannot establish reliance on behalf of every putative Class member, many of whom, like O'Gara, did not even interact with BofA. *See Bennett I* at 8; *cf. In re Auction Rate Sec. (ARS) Mktg. Litig.*, 581 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) ("[T]he actions involve different representations made to each purchaser of ARS, which will necessarily vary from institution to institution (and perhaps from ARS to ARS).").

#### 2. No presumption of reliance is warranted based on the SAC's conclusory allegations that Class members "reasonably assumed" that BAS did not intervene in auctions.

In market-manipulation cases, reliance arises from an investor's belief in market efficiency, coupled with secret market manipulation. *See In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 579 (S.D.N.Y. 2005). Thus, plaintiffs must plead facts that, if true, would

show that defendants' conduct "sen[t] a false price signal to the market" while plaintiffs believed that the market "reflect[ed] undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'" *ATSI Commc'ns*, 493 F.3d at 100 (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)).

The SAC attempts to invoke this reliance presumption by alleging without elaboration that plaintiffs "reasonably assumed that BA ARS traded in an efficient market free of manipulation by BAS." (SAC ¶ 99; *see also id.* ¶¶ 157-58.) This theory fails for at least two reasons. First, plaintiffs' "assumption" that BAS did not intervene in auctions was unreasonable, given the readily-available public disclosures throughout the Class period of the very broker-dealer participation that plaintiffs now brand secret "manipulation." The *Wall Street Journal* reported as early as 2005 that "investors rely on the broker-dealers who conduct the auctions to provide liquidity." (RJN Ex. 2.) The SEC's May 31, 2006 public Cease-And-Desist Order—which the SAC cites—likewise revealed that ARS auctions depended on more than just the "natural interplay of supply and demand" (SAC ¶¶ 48, 139-40, 151, 159): the SEC reported that BAS and other broker-dealers "interven[ed] in auctions by bidding for their proprietary accounts" to prevent failed auctions, set a market rate, and prevent all-hold auctions. (*Id.* ¶¶ 114-15.) And BAS's public website, as well as various publicly available prospectuses (including one for a SLARS that Lead Plaintiff Hamm allegedly purchased), also disclosed BAS's various roles and potential conflicts, and their possible effect on auctions and resulting illiquidity. (SAC ¶ 116; *see supra* at 2-4.) Thus, any Class-wide "assumption" that BAS did not intervene in auctions would not have been reasonable. *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (affirming securities-fraud claims' dismissal because "[i]n light of . . . disclaimers, no reasonable investor could have been misled . . . as to the nature of his investment" and plaintiffs, through "minimal diligence . . . should have discovered the truth").

Second, the SAC does not explain why or how plaintiffs could have "assumed" that there was an efficient "market" for any and all BA ARS. *See In re Van Wagoner Funds, Inc. Sec.*

*Litig.*, No. C 02-3383, 2004 U.S. Dist. LEXIS 24866, at *21 (N.D. Cal. July 27, 2004) (White, J.) (dismissing Section 10(b) claim because generalized allegations could not support reliance presumption based on market efficiency). The SAC alleges an "ARS market" only in conclusory terms, and that this amorphous "market" (i) "developed rapidly" (SAC ¶ 102); and (ii) was promptly affected by "[m]aterial news concerning auction rate securities, including BA ARS, . . . as evidenced by, among other things, the rapid decline in the market price of those securities immediately following the collapse of the auction market in February 2008" (*id.* ¶ 106). These generalized references—perhaps sufficient for cases involving garden-variety, publicly-listed securities—say nothing about how plaintiffs could have assumed that ARS trading was "efficient," such as through the average ARS trading volume or the number of analysts reporting about those securities. *See Van Wagoner Funds*, 2004 U.S. Dist. LEXIS 24866, at *21 (holding that complaint's failure to plead efficient-market characteristics listed in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), precludes reliance presumption); *see also Arena Land & Inv. Co. v. Petty*, 906 F. Supp. 1470, 1481 (D. Utah 1994) (same); *Stinson v. Van Valley Dev. Corp.*, 714 F. Supp. 132, 135 (E.D. Pa. 1989) (same).

3. The Class may not rely on the fraud-created-the-market presumption.

Plaintiffs alternatively plead reliance based on the so-called "fraud created the market" presumption (SAC ¶¶ 194-200), which some courts have applied when the fraud is "'so pervasive that it goes to the very existence of the [securities] and the validity of their presence on the market. . . .'" *In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 810, 1995 U.S. Dist. LEXIS 21147, at *63-64 (S.D.N.Y. Sept. 20, 1995) (quoting *Ross v. Bank S., N.A.*, 885 F.2d 723, 729 (11th Cir. 1989)). But the Ninth Circuit is not one of those courts, so the presumption cannot apply here. *See In re Jenny Craig Sec. Litig.*, No. 92-845, 1992 U.S. Dist. LEXIS 22769, at *17 (S.D. Cal. Dec. 22, 1992) ("The fraud-created-the-market reliance presumption is used in some jurisdictions, but it has not been adopted by the Ninth Circuit."); *In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 805-06 (S.D. Cal. 1990) (declining to adopt fraud-created-the-market theory). Regardless, the SAC's own allegations undermine its assertion that ARS were not "genuine": even after an auction failure, ARS still paid "dividends or interest at a predetermined rate" (SAC

¶ 38) like any debt security. *See, e.g.*, *Colan v. Mesa Petroleum Co.*, 951 F.2d 1512, 1525 (9th Cir. 1991) (explaining that debt securities "pay a fixed sum at a certain maturity date together with periodic interest payments"). In other words, while auction failures frustrated investors' ability to sell their ARS at those periodic forums, they did not render the securities any less "genuine." (SAC ¶ 195.) Nor does the SAC allege a single fact explaining why auction failures demonstrated retroactively that ARS were not "entitled to be marketed" or "legally qualified to be issued" as securities. (*Id.* ¶¶ 195, 198.)

**D. The SAC fails to plead adequately that BofA's conduct caused plaintiffs' alleged loss (Counts I and III).**

"[T]he purpose of the federal securities laws is 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1041 (N.D. Cal. 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Accordingly, a Section 10(b) complaint must sufficiently plead "loss causation," or a proximate causal connection between the alleged fraud and the investor's economic loss. *See, e.g.*, *Metzler Inv. GMBH*, 540 F.3d at 1063 ("[T]he complaint must allege that the practices that the plaintiff contends are fraudulent . . . caused the resulting losses."); *Glenbrook Capital*, 2009 U.S. Dist. LEXIS 30745, at *39 ("[T]o allege loss causation a plaintiff must show the actual economic loss suffered and the causal connection between that loss and the misrepresentation and omission.").

In that regard, a complaint must isolate the loss attributable to fraud from the loss resulting from market-wide conditions. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud decreases."). For example, after the Internet-stock bubble burst in the spring of 2000, an ensuing flurry of lawsuits alleged that issuers, analysts, and others in the Internet sector had committed rampant and undetected fraud. Courts routinely dismissed such claims as hindsight attempts to blame defendants for a market-wide collapse. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 Civ. 9690, 2008 U.S. Dist. LEXIS 44344, at *22 (S.D.N.Y. June 4,

2008) ("[P]laintiff's failure to allege that his losses were due to the purported fraud, rather than the market-wide collapse of the Internet sector, also requires dismissal of his Complaint."); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (dismissing complaint that did not isolate alleged fraud from other causes of plaintiff's loss, such as market-wide Internet stock collapse); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) (dismissing complaint for failure to plead loss causation because telecommunications company's stock-price decline occurred during general industry downturn).

The same logic requires this action's dismissal. Like other recent complaints that have tried to blame the recession on a financial institution, the SAC cannot plead loss causation. *See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, No. 07-5423, 2009 U.S. Dist. LEXIS 74382, at *49-51 (E.D. Pa. Aug. 20, 2009) (noting recent "unprecedented deterioration in market conditions" and dismissing securities-fraud claim where "[p]laintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the significant declines in market value for mortgage-backed securities"). In fact, the SAC affirmatively alleges that BAS was just one of many auction dealers: "As a result of the withdrawal of support by BAS *and other auction dealers*, the auction rate securities market has permanently collapsed, rendering outstanding auction rate securities, including BA ARS, illiquid." (SAC ¶ 72.) Thus, the SAC recognizes that many broker-dealers supported auctions, and that no single broker-dealer, like BofA, could have caused all auctions to fail. "[I]f one auction dealer permitted widespread auction failures," others could choose either to take its place by "buying all securities offered at auction" or "allowing the auctions to fail *en masse*." (SAC ¶ 97.) The SAC thus does not allege that BofA's withdrawal from ARS auctions alone could have caused plaintiffs' alleged losses, absent other broker-dealers' market-wide withdrawal. Accordingly, it fails to plead loss causation. *See Bennett v. H&R Block Financial Advisors*, Inc., No. C 04-4848, 2005 U.S. Dist. LEXIS 25273, at *11 (N.D. Cal. Oct. 27, 2005) (dismissing Section 10(b) complaint for failure to plead loss causation where plaintiffs could not allege that their broker-dealer's actions caused their losses in Enron bonds).

## II. THE SECTION 20(a) CLAIMS AGAINST BAC AND BAS (COUNTS II AND IV) FAIL BECAUSE THE PRIMARY SECTION 10(b) CLAIMS FAIL.

Section 20(a) claims against "control persons" first require a primary Exchange Act violation. *See Glenbrook Capital*, 2009 U.S. Dist. LEXIS 30745, at *51-52 ("Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same."). Because the SAC has not pleaded such a violation, Counts II and IV should be dismissed.

## III. THE SAC SHOULD BE DISMISSED WITH PREJUDICE.

Courts in the Ninth Circuit routinely dismiss with prejudice securities-fraud complaints that plaintiffs have had the opportunity to amend. *See McCasland*, 2009 U.S. Dist. LEXIS 59996, at *24 (noting that "district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint"); *Glenbrook Capital*, 2009 U.S. Dist. LEXIS 30745, at *52 (dismissing with prejudice securities-fraud complaint "[b]ecause there have already been three iterations of the complaint filed in this matter and the Court is not satisfied that Plaintiffs would be able to plead any additional facts"); *Pittleman*, 2009 U.S. Dist. LEXIS 18213, at *11 (dismissing complaint without leave to amend because plaintiffs could not plead scienter in "case . . . about a company involved in a volatile industry at the onset of a long, destructive economic downturn"). Here, plaintiffs chose to amend their complaint rather than respond to BofA's first motion to dismiss. Because the SAC suffers from many of the same defects as the First Amended Complaint (and several new ones), it should be dismissed with prejudice.

## CONCLUSION

The third iteration of plaintiffs' complaint again runs afoul of the PSLRA and Rule 9(b). Those pleading rules are designed to prevent plaintiffs from attributing investment losses to hindsight fraud. The SAC is devoid of particularized facts that could establish (i) actual manipulation or class misrepresentations, (ii) a cogent and compelling inference that BofA acted with the intent to defraud, (iii) a presumption of reliance, or (iv) that BofA's alleged conduct alone—rather than an unprecedented market-wide phenomenon—caused plaintiffs' losses. The SAC should be dismissed with prejudice.

Dated: September 9, 2009

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Debra S. Belaga

Debra S. Belaga (S.B. #083237)
Aaron M. Rofkahr (S.B. #227008)
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
Email: dbelaga@omm.com
arofkahr@omm.com

Jonathan Rosenberg (admitted *pro hac vice*)
B. Andrew Bednark (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrosenberg@omm.com
abednark@omm.com

Robert M. Stern (admitted *pro hac vice*)
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: rstern@omm.com

*Attorneys for Defendants*