1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: BANK OF AMERICA CORP.
AUCTION RATE SECURITIES (ARS)
MARKETING LITIGATION,

This document applies to:

*Bondar v. Bank of America Corporation, et al.,*
08-CV-2599-JSW

_____/

No. 09-md-02014 JSW

**ORDER GRANTING MOTION TO DISMISS**

**INTRODUCTION**

This matter comes before the Court upon consideration of the Motion to Dismiss filed by Defendants Banc of America Securities, LLC ("BAS") and Bank of America Corporation ("BAC") (collectively "BofA").  Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY GRANTS BofA's motion.  The Court also shall grant N.R. Hamm Quarry, Inc. ("Hamm") and Ed O'Gara ("O'Gara") (collectively "Lead Plaintiffs") one final opportunity to amend their claims.

**BACKGROUND**

**A.     Procedural History.**

This case is one of the many cases that have been filed around the country in the wake of the collapse of the Auction Rate Securities ("ARS") market in February 2008.  On May 22, 2008, Richard S. Bondar filed a putative class action complaint against BAS, BAC, and Banc of America Investment Services, Inc. ("BAIS").  *Bondar v. Bank of America Corporation,* No. 08-CV-2599-JSW.

United States District Court
For the Northern District of California

1    On February 12, 2009, the Judicial Panel on Multidistrict Litigation transferred two

2    additional cases to the undersigned for consolidated or coordinated pretrial proceedings.[1]

3    Thereafter, the parties engaged in several rounds of motion practice relating to the appointment

4    of lead plaintiffs, and BofA filed several motions to dismiss, which were rendered moot before

5    the Court ruled.  On May 4, 2010, Lead Plaintiffs filed the Consolidated Class Action and

6    Individual Complaint ("CAC"), on behalf of themselves and on behalf of all persons or entities

7    who, between May 22, 2003 and February 13, 2008, inclusive ("Class Period"), purchased ARS

8    for which BAS served as sole broker-dealer, lead broker-dealer, co-lead broker-dealer, or joint

9    lead broker-dealer ("BA ARS") or who purchased ARS from BAS.

10   In the CAC, Lead Plaintiffs assert claims: (1) against BAS for violations of Section

11   10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and

12   Securities and Exchange Commission Rules 10b-5(a)-(c), promulgated thereunder, 17 C.F.R. §

13   240.10b-5(a)-(c) (Counts I and III), (2) against BAC as a "control person," pursuant to Section

14   20(a) of the Exchange Act (Counts II and IV).

15   **B.    Factual Background.**

16   **1.    Auction Rate Securities.**

17   ARS are "bonds or preferred stocks that paid interest or dividends at rates set at period

18   auctions."  (CAC ¶¶ 30.)  The market for ARS experienced dramatic growth after they were

19   introduced in 1984.  At their introduction, ARS were available only highly sophisticated

20   institutional investors, who could invest with a minimum purchase of at least $250,000.  (*Id.*

21   ¶¶ 31-32.)  At some point before the start of the Class Period, ARS issuers and ARS

22   underwriters lowered the minimum investment to $25,000, which enabled ARS sellers to

23   market ARS to retail investors, including individuals, charities and small businesses.  (*Id.* ¶ 32.)

24   At the end of 2005, approximately $263 billion of ARS were outstanding.  By February 2008,

25   the market exceeded $330 billion.  (*Id.* ¶ 31.)

26

27   [1]    The MDL panel subsequently transferred additional cases to this Court,
including *Aeroflex, Inc. v. Bank of America Corporation,* 09-CV-5245-JSW.  Aeroflex was a

28   party to the CAC, but dismissed its claims with prejudice on February 1, 2011.  Thus, with
the exception of the *Bondar* case, all of the transferred cases have now been dismissed.

United States District Court

For the Northern District of California

ARS "typically traded at par value through periodic 'Dutch' auctions generally held every 7, 28, 35 or 49 days." (*Id.* ¶ 33.) The auctions "determined which investors would own the securities as well as the 'clearing rate,' the rate of interest or dividends paid on those securities until the next periodic auction." (*Id.*) ARS "allowed issuers to obtain long-term financing at short-term interest rates." In turn, ARS were attractive to investors, who were willing to accept short-term rates because BAS marketed ARS as "cash management vehicles similar to money market funds." Thus, investors believed ARS "could readily be disposed of at par through the periodic auctions." (*Id.* ¶ 34.)

"In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate. All shares for sale were purchased, and the clearing rate, *i.e.*, the lowest interest rate or dividend rate at which all sale orders could be fulfilled, applied to all securities sold until the next auction." (*Id.* ¶ 36.) In a "failed auction," supply exceeded demand. The result of a failed auction was that investors could not sell their shares in ARS, rendering their investment illiquid. (*Id.* ¶¶ 36-38.) Investors were, however, entitled to collect dividends or interest at a predetermined rate, typically referred to as the "maximum rate" until the next auction. (*Id.* ¶ 37.)

> In theory, the maximum rate was intended to insure that the [ARS] remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of the [ARS] were fundamentally altered. An [ARS] that carried a low maximum rate was entirely dependent on the broker-dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the broker-dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

(*Id.* ¶ 38.)

### 2.   BofA's Conduct and the Collapse of the ARS Market.

Throughout the Class Period, BAS "underwrote billions of dollars of [ARS] placing additional supply in an already saturated market." (CAC ¶ 50.) In order to accommodate issuer demands and obtain high credit ratings, BAS issued "most BA ARS with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure." (*Id.*) BAS needed to take action to suppress auction failures to prevent the investors from

3

United States District Court

For the Northern District of California

discovering these low maximum rates.  (*Id.*)  BAS allegedly achieved this objective through a variety of deceptive and manipulative tactics, which were designed to create the appearance of a functioning auction market, in which ARS traded in accordance with actual supply and demand.  (*Id.* ¶ 51.)

Specifically, BAS, through its ARS Desk, is alleged to have systematically and routinely intervened in auctions.  BAS used its own capital to place "'support bids' in every auction for which BAS served as the sole or lead broker-dealer ... pursuant to tacit understandings with the issuers of BA ARS that BAS would act to prevent auction failures." (*Id.* ¶¶ 53-54.)  Lead Plaintiffs allege that the New York Attorney General investigated BAS and confirmed that it "placed support bids for the entire notional value of the securities in every auction for which [BAS] served as the sole or lead broker-dealer."  (*Id.* ¶¶ 55-56.)  "BAS was able to place support bids and prevent auctions from failing because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors."  (*Id.* ¶ 57.)  By way of example, "between August 2006 and February 2008, BAS placed support bids for the entire notional value of Missouri Higher Education Loan Authority ("MOHELA") Taxable Auction Rate Bonds, Senior 2004F," which Hamm purchased in August 2007.  (*Id.*      ¶ 56 (setting forth dates of auctions, amount purchased by BAS due to support bids, and clearing rate set by BAS); *see also* ¶¶ 58-63.)

BAS also allegedly systematically intervened in auctions in order to set the clearing rate for the auctions that would have failed but for its support bids.  (*Id.* ¶ 64.)  "For each auction, BAS knew all the bids that had been placed by both holders and prospective buyers of the securities.  Armed with this information, BAS placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates."  (*Id.*)  BAS set interest rates in "such a manner as to promote continued sales of [ARS] to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom BAS depended for continuing business and attending underwriting commissions and broker-dealer fees."  (*Id.* ¶ 65.)

United States District Court

For the Northern District of California

When BAS intervened in auctions, it added to its own BA ARS inventory.  Lead Plaintiffs allege that BAS did not need or want to own those BA ARS.  Thus, BAS reduced its inventory by selling BA ARS between auction periods at the clearing rate that BAS established at the previous auction.  (*Id.* ¶¶ 66-67.)  Again, by way of specific example, between August 2006 and February 2008, BAS sold millions of dollars of the MOHELA security to investors in the days following auctions in which BAS had placed support bids to prevent an auction failure.  (*Id.* ¶ 68.)

"Many BA ARS, particularly those backed by student loans, contained caps on the clearing rates that issuers paid to investors."  (*Id.* ¶ 70.)  During the "fall of 2007," BAS placed support bids "in such a manner as to increase the clearing rates for BA ARS - to the point of approaching the rate caps - in an effort to 'salt the mine' by raising the interest rates on the securities to a level sufficient to attract new buyers and avoid auction failures."  (*Id.*)  Investors in BA ARS, however, were unaware that if the rate caps were triggered, the interest rates on "many BA ARS would be reset automatically to levels well below market rates for comparable securities...."  (*Id.*)  In order to avoid triggering the rate caps, and again unbeknownst to BAS' investors, BAS "colluded" with issuers to obtain temporary rate cap waivers, which would expire in early 2008.  By December 2007, BA ARS issuers had executed 48 rate cap waivers.  (*Id.* ¶¶ 71-72.)

Lead Plaintiffs also allege that BAS omitted material information and made material misrepresentations in sales pitches, website disclosures, and offering memoranda.  For example, BAS allegedly marketed ARS as "equivalent to cash and safe, highly liquid, and appropriate as short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest," when BAS knew they were not.  (*Id.* ¶¶ 75-76.)  BAS also allegedly failed to disclose to investors, *inter alia*, its involvement in the auction process, including the fact that it systematically supported and manipulated the market for BA ARS to maintain an appearance of liquidity and stability.  (*Id.* ¶ 77(a)-(p); *see also id.* ¶¶ 78-101 (setting forth alleged omissions in BAS Website and BA ARS offering memoranda).)

1    In August 2007, the market for BA ARS came under increased stress because of the

2    deteriorating credit environment.  As a result, BAS needed to provide greater levels of support

3    to prevent auction failures.  BAS allegedly had undisclosed internal limits on the quantity of

4    ARS it could hold in its inventory, and, by December 2007, it had made plans to exit the ARS

5    market "to avoid further straining its inventory limits."  (CAC ¶¶ 77(g)-(j).)

6    On February 13, 2008, BAS, and other major broker-dealers refused to continue to

7    support ARS auctions, 87% of all ARS auctions failed, and the market for ARS collapsed.  (*Id.*

8    ¶¶ 103.)  On October 8, 2008, the New York Attorney General announced that BAS and its

9    affiliate BAIS had agreed to a settlement in principle with state securities regulators relating to

10   ARS.[2]  Pursuant to the settlement, BAS and BAIS agreed to restore over $4.5 billion in

11   liquidity to certain clients holding ARS and agreed to a civil penalty of $50 million.  (*Id.* ¶

12   146.)  On that same date, the SEC announced that BAS and BAIS had agreed to a settlement in

13   principle with federal and state regulators.  On June 3, 2009, the SEC filed a complaint and

14   consent judgment against BAS and BAIS.  (*Id.* ¶¶ 147-148.)  Lead Plaintiffs have not been able

15   to benefit from these settlements and either continue to hold illiquid ARS or have sold them on

16   the secondary market at a loss.  (*Id.* ¶¶ 12-13, 150, 162, 171, 196.)[3]

17   The Court shall address specific additional facts in the remainder of this Order.

18   **ANALYSIS**

19   **A.    Applicable Legal Standards for Motion to Dismiss Under Federal Rule of Civil
         Procedure 12(b)(6) ("Rule 12(b)(6)")**

20

21   A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a

22   claim upon which relief can be granted.  The complaint is construed in the light most favorable

23   to the non-moving party and all material allegations in the complaint are taken to be true.

24   *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986).  The Court may consider the facts

25   _____

26   [2]    Lead Plaintiffs had named BAIS as a defendant, but have not included BAIS
     in the CAC.  (*Compare* Docket No. 114 (Second Amended Complaint ¶¶ 14-16) with Docket
     No. 132 (CAC ¶¶ 16-17).)

27

28   [3]    Lead Plaintiffs acknowledge that a secondary market for ARS has developed,
     but they claim that they cannot sell their ARS holdings at par value on that market.  (CAC ¶
     198.)

**United States District Court**
For the Northern District of California

1   alleged in the complaint, documents attached to the complaint, documents relied upon but not

2   attached to the complaint, when the authenticity of those documents is not questioned, and

3   other matters of which the Court can take judicial notice.  *Zucco Partners LLC v. Digimarc*

4   *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

5        Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the

6   claim showing that the pleader is entitled to relief."  Even under Rule 8(a)'s liberal pleading

7   standard, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

8   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

9   of action will not do."  *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing

10  *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Pursuant to *Twombly*, a plaintiff must not

11  merely allege conduct that is conceivable but must instead allege "enough facts to state a claim

12  to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the

13  plaintiff pleads factual content that allows the court to draw the reasonable inference that the

14  defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

15  (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a

16  probability requirement, but it asks for more than a sheer possibility that a defendant has acted

17  unlawfully. ... When a complaint pleads facts that are merely consistent with a defendant's

18  liability, it stops short of the line between possibility and plausibility of entitlement to relief."

19  *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

20       Where a plaintiff alleges fraud, however, Federal Rule of Civil Procedure 9(b) requires

21  the plaintiff to state with particularity the circumstances constituting fraud, including the "who,

22  what, when, where, and how" of the charged misconduct.  *See Vess v. Ciba Geigy Corp. USA,*

23  317 F.3d 1097, 1106 (9th Cir. 2003); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49

24  (9th Cir. 1994).  In the securities context, the pleading requirements are even more stringent.

25  **B.    Private Securities Litigation Reform Act ("PSLRA").**

26       "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5

27  must satisfy the dual pleading requirements of ... Rule 9(b) and the PSLRA."  *Zucco Partners*,

28  552 F.3d at 990.  The PSLRA requires that "a complaint 'plead with particularity both falsity

United States District Court

For the Northern District of California

1   and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002), in turn

2   quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).  Where a plaintiff asserts a

3   Section 20(a) claim based on an underlying violation of Section 10(b), the pleading

4   requirements for both violations are the same.  *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F.

5   Supp. 2d 1051, 1063 (N.D. Cal. 2002).

6          Under the PSLRA, actions based on allegations of material misstatements or omissions

7   must "specify each statement alleged to have been misleading, the reason or reasons why the

8   statement is misleading, and, if an allegation regarding the statement or omission is made on

9   information and belief, the complaint shall state with particularity all facts on which that belief

10  is formed." 15 U.S.C. §78u-4(b)(1).  In order to adequately plead scienter, the PSLRA

11  requires that the plaintiff "'state with particularity facts giving rise to a strong inference that

12  the defendant acted with the required state of mind.'"  *Zucco Partners*, 552 F.3d at 991

13  (quoting 15 U.S.C. § 78u-4(b)(2)).  If the allegations are insufficient to state a claim, a court

14  should grant leave to amend, "unless it is clear that the complaint could not be saved by any

15  amendment."  *Id.* at 989 (quoting *Livid Holdings, Ltd. v. Solomon Smith Barney, Inc.*, 416 F.3d

16  940, 946 (9th Cir. 2005)).

17  **C.     BofA's Requests for Judicial Notice Are Granted, in Part.**

18         A court may take judicial notice of facts that are "not subject to reasonable dispute in

19  that [they are] either (1) generally known within the territorial jurisdiction of the trial court or

20  (2) capable of accurate and ready determination by resort to sources whose accuracy cannot

21  reasonably be questioned."  Fed. R. Evid. 201(b).

22         BofA asks that the Court take judicial notice of, *inter alia*, offering memoranda for the

23  BA ARS that Hamm purchased, an order issued in 2006 by the Securities and Exchange

24  Commission ("SEC"), disclosures regarding ARS that BAS posted on its website, emails that

25  BAS sent to Hamm, and information regarding the historical rates of return for U.S. Treasury

26  securities and the London Interbank Offered Rate ("LIBOR").  (Request for Judicial Notice

27  ("RJN"), Exs. 1, 7-14, 20, 22-23.)  Lead Plaintiffs have not objected to these documents.

28  Because these documents either are referenced in the complaint or are publicly available

1   information, they are the proper subject of judicial notice.  Accordingly, the Court grants

2   BofA's request for judicial notice as to Exhibits 1, 7-14, 20, 22-23.  The Court also shall take

3   judicial notice of Exhibits 1 and 2 to BofA's second request for judicial notice ("Second

4   RJN"), which it submitted with its reply brief.

5        BofA also asks the Court to take judicial notice of news articles and public reports

6   regarding ARS, which it submits as Exhibits 3-6, 15-19, 21, and 24-28.  Lead Plaintiffs object

7   to these requests.  Because the Court did not rely on these documents to resolve this motion,

8   BofA's request for judicial notice of these documents is denied as moot.

9        Lead Plaintiffs also object to the Declaration of Jason Glidden, on the basis that the

10   declaration contains information beyond the scope of the CAC.  The Court agrees and sustains,

11   in part, Lead Plaintiffs' objections to that declaration.  Accordingly, the Court has not

12   considered the Glidden Declaration, except to the extent it authenticates Exhibits 12-14 to

13   BofA's RJN.

14   **D.     The Court Dismisses Counts I and II, With Leave to Amend.**

15        To plead a claim based on market manipulation, a plaintiff must allege, *inter alia*, that

16   the defendant engaged in manipulative acts, that the plaintiff suffered damage, which was

17   caused by his or her reliance on an assumption that the market was free of manipulation, and

18   that the defendant acted with scienter.  *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

19   F.3d 87, 101 (2d Cir. 2007).  A claim for market manipulation is subject to Rule 9(b)'s

20   heightened pleading standards, but, because it "can involve facts solely within the defendant's

21   knowledge ... at the early stages of litigation, the plaintiff need not plead manipulation to the

22   same degree of specificity as a plain misrepresentation claim."  *Id.* at 102.

23        BofA moves to dismiss Lead Plaintiffs' market manipulation claims on the basis that

24   Lead Plaintiffs fail to allege facts supporting each of the elements of their claim and on the

25   basis that Lead Plaintiffs' allegations are conclusory and fail to satisfy Rule 9(b)'s pleading

26   requirements.

27   //

28   //

**United States District Court**
For the Northern District of California

1          **1.     Manipulative Acts.**

2          Lead Plaintiffs allege that, between May 22, 2003 and February 13, 2008, BAS

3   manipulated the market by: (1) placing support bids for the entire notional amount of the

4   securities in every auction for which it was the sole or lead broker-dealer to prevent auction

5   failures; (2) systematically intervening in auctions to set the clearing rate; and (3) obtaining

6   temporary rate cap waivers.[4]  "Manipulation is virtually a term of art when used in connection

7   with securities markets."  *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977) (internal

8   quotations and citations omitted).  In essence, the term "'connotes intentional or willful

9   conduct designed to deceive or defraud investors by controlling or artificially affecting the

10  price of securities.'"  *ATSI*, 493 F.3d at 100 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S.

11  185, 199 (1976)).

12         Deception arises when an investor is erroneously lead to believe that the prices for the

13  security in question are driven by the "'natural interplay of supply and demand, not rigged by

14  manipulators.'"  *Id.* (quoting *Gurary v. Winehouse*, 193 F.3d 37, 45 (2d Cir. 1999)).

15  "[N]ondisclosure is usually essential to the success of a manipulative scheme."  *Santa Fe*, 430

16  U.S. at 477; *see also In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 WL

17  2541166, at *17 (S.D.N.Y. June 24, 2010) ("*UBS*").  Thus, "[t]he market is not mislead when a

18  transaction's terms are fully disclosed."  *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F.

19  Supp. 2d 378, 390 (S.D.N.Y. 2010) ("*Merrill Lynch*").

20         Recently, courts in other districts have dismissed similar market manipulation claims

21  on the basis that the defendants in those cases disclosed the allegedly manipulative conduct.

22  For example, in the *UBS* case, the defendants disclosed in prospectuses that they placed

23  support bids in auctions and also disclosed that they had an advantage when doing do, because

24  ───────────────

25         [4]     Lead Plaintiffs acknowledge that broker-dealers are not barred from
    participating in auctions.  (CAC ¶ 39.)  Indeed, the SEC investigated the auction practices of
26  BAS and other auction dealers, and it issued an Order Instituting Administrative and Cease-
    And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and A Cease-
27  And-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of
    the Securities Exchange Act of 1934 (the "Broker-Dealer Order"), to which BAS was a
28  party.  In that order, the SEC stated that broker-dealers are not prohibited from bidding for
    their proprietary accounts "when properly disclosed."  (RJN, Ex. 7 (Broker-Dealer Order at 6
    n. 6).)

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  they had access to certain information when placing those bids.  *UBS*, 2010 WL 2541166, at

2  *17-18.  In light of those facts, the court concluded that plaintiffs could not have been

3  deceived, because the "documents disclosed that the ARS market was not necessarily set by

4  the 'natural interplay of supply and demand,' but that it could be influenced by broker dealers."

5  *Id.*, at *18.

6          In the *Merrill Lynch* case, the court concluded that plaintiffs had not sufficiently

7  alleged that the defendant "sent a false pricing signal to the market."  704 F. Supp. 2d at 391.

8  The court noted that Merrill Lynch, in response to the Broker-Dealer Order, posted a

9  disclosure document on its website that it was permitted, but not obligated, to submit orders in

10  auctions for its own account and routinely did so in its sole discretion.  *Id.* at 385-86.  Merrill

11  Lynch also disclosed: the advantages it might have over other bidders as a result of this

12  practice; that when it was the sole auction dealer, it could discern the clearing rate before

13  orders were submitted and could set the clearing rate with its order; that it was not obligated to

14  continue to place bids; and that investors should not assume it would continue to place bids or

15  that auction failures would not occur.  *Id.* at 386.  Merrill Lynch prospectuses included similar

16  disclosures.  *Id.* at 386-87.

17          The court concluded that these disclosures "negate the Plaintiffs' claims that Merrill

18  Lynch misled the market into believing that the price of the securities and the clearing rates set

19  by the auctions were dictated by the natural interplay of supply and demand."  *Id.* at 392.  The

20  court also rejected the plaintiffs' argument that because Merrill Lynch "systematically," rather

21  than "routinely," submitted support bids, the disclosures were inadequate.  The court also

22  found that the defendants adequately "disclosed that the lack of auction failures was not

23  indicative of the health of the ARS market."  *Id.* at 392-93.  "These disclosures, issued in the

24  wake of the [Broker-Dealer Order] preclude the plaintiffs from pleading manipulative acts as a

25  matter of law."  *Id.* at 393; *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 09-MD-2030

26  (LAP), 2011 WL 536437, at *6 (S.D.N.Y. Feb. 9, 2011).

27          The Court finds that Lead Plaintiffs' allegations in this case are similar to the plaintiffs'

28  allegations in the *UBS* and *Merrill Lynch* cases.  After the SEC issued the Broker-Dealer

Order, BAS posted a document regarding its ARS practices on its public website.  (RJN, Ex. 8

(Bank of America Securities LLC Material Auction Practices and Procedures, dated May 31,

2006).)  In that document, BAS stated that "[i]n connection with any particular auction, BAS is

permitted, but is not obligated to submit orders for its own account either as a bidder or as a

seller, *and routinely does so* in its sole discretion; even after obtaining knowledge of some or

all of the other orders submitted through it."  (*Id.* at 1 (emphasis added).)  BAS also disclosed

that, as a result of these practices, BAS was likely to have an advantage over other bidders, that

bids submitted by BAS might be designed to prevent auction failures or to prevent an auction

from clearing at a rate that BAS believes is not a market rate, and that investors "should not

assume that BAS will place a bid in any particular auction, or that Failed Auctions or

unfavorable auction rates will not occur."  (*Id.*; *see also id.* at 2 (noting that BAS may submit a

bid in an auction to keep it from failing, but is not obligated to do so).)  An offering

memoranda for one of the BA ARS that Hamm purchased contains similar descriptions of

BAS' auction practices.  It also stated that BAS could - and did - bid for its own account, that

BAS' actions could affect the clearing rates, and that "[b]ecause of these practices, the fact that

an Auction ... clears successfully does not mean that an investment ... involves no significant

liquidity or credit risk."  (*See id.*, Ex. 1 (Offering Memorandum at 13-15).)

Lead Plaintiffs do allege that BAS "placed support bids for the entire notional value of

the securities in every auction for which it served as the sole or lead broker dealer."  (CAC ¶

55.)  Although that fact distinguishes this case from the *UBS* case, the plaintiffs in the *Merrill

Lynch* case made similar allegations, which that court found insufficient to state a claim.

*Merrill Lynch*, 704 F. Supp. 2d at 392.  The Court finds the reasoning of the *Merrill Lynch*

case persuasive, and it concludes that, in light of BAS' disclosures, Lead Plaintiffs' allegations

regarding BAS' conduct in "every" auction are insufficient to state a market manipulation

claim.  BAS disclosed - without qualification - that BAS "routinely does" submit orders for its

own account and the impact such action could have on preventing auction failures and on

setting the clearing rate.  *Compare Defer v. Raymond James Fin., Inc.*, No. 08 Civ. 3449

(LAK), 2010 U.S. Dist. LEXIS 91856, at *38-39 (S.D.N.Y. Sept. 2, 2010) ("*Defer II*") (finding

1    allegations that defendant "may routinely" and "in exceptional circumstances ... may" submit

2    support bids insufficient to disclose risk at core of complaint).

3         The language BAS used in its disclosures is similar to the language used in the

4    disclosures at issue in the *UBS* and *Merrill Lynch* cases and similarly revealed that "the ARS

5    market was not necessarily set by the 'natural interplay of supply and demand,' but ... could be

6    influenced by broker dealers." *UBS*, 2010 WL 2541166 at *18; *see also Merrill Lynch*, 704 F.

7    Supp. 2d at 392-93 (and rejecting plaintiffs' argument that disclosures were insufficient as

8    "unavailing").  Therefore, the Court finds that Lead Plaintiffs have not stated a market

9    manipulation claim based on BAS' placement of support bids or based on the impact BAS

10   could have on the clearing rate.

11        The Court, however, does not find persuasive BofA's argument that it fully disclosed

12   its conduct with respect to rate cap waivers.  In contrast to the allegations regarding the

13   placement of support bids and the impact of BAS' actions on the clearing rate, neither the

14   website disclosure nor the offering memoranda contain any specific disclosures about the rate

15   cap waivers.  (RJN Exs. 1, 8, 20.)  In the *UBS* case, the court found that "the undisclosed

16   practice of seeking and obtaining temporary cap waivers with respect to certain ARS combined

17   with the practice of setting ... clearing rates at amounts in excess of the interest rates limits

18   specified in the offering documents - which limits would kick in, in the absence of and upon

19   expiration of the temporary waivers - resulted in the market prices of these ARS being

20   artificially inflated."  These actions therefore sent a "false pricing signal to the market." *UBS*,

21   2010 WL 2541166, at * 21.

22        However, to successfully plead a market manipulation claim, a plaintiff must set forth

23   "to the extent possible, 'what manipulative acts were performed, which defendants performed

24   them, when the manipulative acts were performed, and what effect the scheme had on the

25   market for the securities at issue." *ATSI*, 493 F.3d at 102 (quoting *Baxter v. A.R. Baron & Co.*,

26   No. 94 Civ 3913 (JGK), 1995 WL 600720 at *6 (S.D.N.Y. Oct. 12, 1995)).  In the *UBS* case,

27   although the court found that the defendants' conduct with respect to the rate cap waivers was

28   the type of conduct that could support a market manipulation claim, it also found that the

United States District Court

For the Northern District of California

1  plaintiffs had not set forth "what effect the scheme had on the market." Thus, the court

2  concluded that they failed to state a claim based on that conduct. *UBS*, 2010 WL 2541166, at

3  *22. Like the plaintiffs in that case, Lead Plaintiffs have not alleged that every BA ARS

4  contained interest rate caps. (*See* CAC ¶ 70 ( "many" BA ARS contained rate caps).) In

5  addition, Lead Plaintiffs do not allege that any of the specific BA ARS they purchased

6  contained interest rate caps and do not set forth specific dates on which BAS obtained rate cap

7  waivers. Rather, as in *UBS*, Lead Plaintiffs make vague and conclusory allegations that, at

8  some point in "the fall of 2007," BAS "colluded" with unspecified issuers to obtain the rate

9  cap waivers.

10      Accordingly, the Court concludes that Lead Plaintiffs fail to allege particularized facts

11  demonstrating the effect of the rate cap waivers had on the market for BA ARS, and they fail

12  to state a claim for market manipulation based on that conduct. *UBS*, 2010 WL 2541166, at

13  *22. Because it is not clear that Lead Plaintiffs could not cure this defect, the Court shall

14  address the remaining elements of this claim.

15          **2.      Scienter.**

16      "To adequately demonstrate that the 'defendant acted with the required state of mind,'

17  a complaint must 'allege that the defendants made false or misleading statements either

18  intentionally or with deliberate recklessness.'" *Zucco Partners*, 552 F.3d at 991 (quoting *In re*

19  *Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005)). The Ninth Circuit recently clarified

20  that a court should "conduct a dual inquiry," when it evaluates allegations of scienter. *Id.* at

21  991-92. First, a court should determine "whether any of the plaintiff's allegations, standing

22  alone are sufficient to create a strong inference of scienter." *Id.* at 992. Second, "if no

23  individual allegations are sufficient," a court should "conduct a 'holistic' review of the same

24  allegations to determine whether the individual allegations combine to create a strong

25  inference of intentional conduct or deliberate recklessness." *Id.*; *accord Sicracusano*, 585 F.3d

26  at 1180.

27      "'[I]n determining whether the pleaded facts give rise to a strong inference of scienter,

28  the court must take into account plausible opposing inferences.'" *Id.* (quoting *Tellabs, Inc. v.*

United States District Court

For the Northern District of California

1   *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)).  A plaintiff sufficiently alleges

2   scienter "only if a reasonable person would deem the inference of scienter cogent and at least

3   as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551

4   U.S. at 324.  The inquiry "is inherently comparative."  *Id.*  "A court must compare the

5   malicious and innocent inferences cognizable from the facts pled in the complaint, and only

6   allow the complaint to survive a motion to dismiss if the malicious inference is at least as

7   compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d 991 (citing

8   *Tellabs*, 551 U.S. at 324).

9          Lead Plaintiffs support their argument that BAS acted with scienter with the following

10  factual allegations: (1) BAS earned lucrative fees in connection with its role in the BA ARS

11  market; (2) BAS took advantage of the opportunity to manipulate the BA ARS market; (3)

12  BAS knew that BA ARS lacked sufficient maximum rates to ensure liquidity in the event of a

13  failed auction; (4) BAS's scheme was designed to limit its own exposure to BA ARS; (5) BAS

14  knew that the market for BA ARS was increasingly fragile and unsustainable; (6) BAS

15  expected to benefit from the collapse of the BA ARS market; and (7) BAS acted in concert

16  with other broker-dealers.  (*See generally* CAC ¶¶ 105-143.)

17         The Class Period begins on May 22, 2003 and runs through February 13, 2008.  The

18  Court first examines Lead Plaintiffs' allegations of scienter for the period between May 22,

19  2003 and November 2007, and it finds them insufficient.  Within this time frame, Lead

20  Plaintiffs do no more than allege generally that "BAS earned substantial fees for its services"

21  from issuers of ARS.  (CAC ¶¶ 105-106.)  The desire to earn commissions or fees is a common

22  motive to "all for profit enterprises, and that motive - without more - is insufficient to give rise

23  to a strong inference of scienter.  *See, e.g., Dow Corning Corp. v. BB&T Corp.*, No. 09-5637

24  (FSH) (PS), 2010 U.S. Dist. LEXIS 124031, at *26 (D.N.J. Nov. 23, 2010); *Vining v.*

25  *Oppenheimer Holdings, Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *7 (S.D.N.Y.

26  Sept. 29, 2010); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y.

27  2009); *Defer v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("*Defer*

28  *I*").

Further, as discussed above, Lead Plaintiffs fail to sufficiently allege the manipulative acts on which this alleged scheme is based.  Thus, their allegations within this same time frame are too vague and conclusory to support a strong inference of scienter.  The Court, therefore, finds unpersuasive Lead Plaintiffs' argument that BAS acted in a manner that is so clearly or obviously manipulative that it must have been done with the intent to defraud.  *See Dow Corning*, 2010 U.S. Dist. LEXIS 124031, at *30 (finding that plaintiffs' allegations did not support a strong inference of scienter for "conducting occurring before Fall 2007, since the ARS market at that time was not yet alleged to be illiquid"); *Defer II*, 2010 U.S. Dist. LEXIS 91856, at *18-21 (finding that plaintiffs' allegations that defendants were "reckless in not knowing that the ARS market appeared to be liquid only because of auction broker intervention" were too vague and conclusory to support a strong inference of scienter for period prior to November 2007); *Vining*, 2010 WL 3825722, at *9-14 (finding that, taken as a whole, allegations regarding, *inter alia*, defendant's general knowledge regarding broker-dearer interventions and features of ARS, failed auctions in 2007, and allegations of purported knowledge that other broker-dealers would exit market, did not support strong inference of scienter).

Lead Plaintiffs also allege that BAS was motivated by a desire to unload its inventory of ARS on to unsuspecting investors.  However, "[a] motive must antedate the alleged fraud." *Defer II*, 2010 U.S. Dist. LEXIS 91856, at *15.  In *Defer II*, the plaintiffs alleged, as Lead Plaintiffs do here, that the defendants acted with scienter because, beginning in November 2007, they decided to unload their ARS inventory as auctions began to fail.  *Id.* at *15-16.  The court concluded that the plaintiffs failed to allege a motive for fraudulent behavior between April 2003 and November 2007, because, "according to the [complaint], the alleged fraud began at least as early as April 2003, over four years before [the defendant] allegedly came to the conclusion that it should unload the ARS held for its own account on its customers."  *Id.* at *16.  As in *Defer II*, Lead Plaintiffs allegations regarding BAS' decision to unload its ARS inventory does not support a strong inference of scienter for the period between May 22, 2003 and November 2007.

United States District Court

For the Northern District of California

The Court next examines time period between November 2007 and February 13, 2008, when the ARS market collapsed, and finds the *Dow Corning* and *Defer II* cases to be instructive. In *Dow Corning*, the plaintiffs alleged that the defendants, by virtue of their positions as auction dealers, knew investor demand for ARS was shrinking and that other broker-dealers were increasing support bids to prevent auction failures. The plaintiffs also alleged that the defendants continued to increase their ARS inventory. As a result, the defendants had to continue to place support bids to prevent auction failures so that they could keep a market alive as they attempted to sell off their inventory to investors. *Dow Corning*, 2010 U.S. Dist. LEXIS 124031, at *28-29. Although the defendants argued that it would be "economically irrational" to act in such a way, the court rejected this argument and found that, with respect to the time period between "Fall 2007" and February 13, 2008, plaintiffs had adequately alleged scienter. *Id.*, at *29-30.

In *Defer II*, the plaintiffs alleged that, beginning in November 2007, the defendant had allegedly developed a plan to "unload ... ARS inventory" on unsuspecting investors to comply with internal risk limits. Coupled with allegations regarding the "deterioration of the ARS market that began in August 2007," the court found it "quite reasonable to infer that [the defendant] then had a motive to conceal the ARS illiquidity risk from customers to whom it hoped to sell ARS from its own portfolio." *Defer II*, 2010 U.S. Dist. LEXIS 91856, at *16. The court also noted that the plaintiffs' theory of scienter was that the defendant "knew or was reckless in not knowing that the ARS market appeared to be liquid only because of auction broker intervention," but it found that plaintiffs' complaint consisted of conclusory allegations regarding the defendant's knowledge of these facts. *Id.*, at *18-19 & n.72; *see also id.*, at *17-26. Ultimately, the court found that plaintiffs alleged a cogent and compelling inference of scienter only with respect to the period between November 2007 and February 13, 2008. *Id.*, at *26.

In this case, Lead Plaintiffs allege that, following the initial wave of auction failures in late August 2007, BAS began to feel pressure to reduce its inventory of BA ARS. For example, Lead Plaintiffs allege that on August 29, 2007, BAS held a "Teach In" for its brokers,

17

United States District Court

For the Northern District of California

1   which was designed to get brokers to market student loan-backed ARS more aggressively but

2   which also minimized the risk associated with BA ARS.  (CAC ¶¶ 115-118.)   Lead Plaintiffs

3   also quote from emails, dated September and October 2007, sent by "the executive in charge of

4   ARS Desk" and BAS' risk manager, in which they discussed the increase in ARS inventory

5   and BAS' "outsized ... exposure" to certain ARS.  Lead Plaintiffs also quote from additional

6   emails that BAS executives sent throughout November and December 2007, in which these

7   executives continued to warn of BAS' increased exposure based on its ARS inventory and to

8   warn of the fact that BAS was approaching "the limit of its ability to continue to place support

9   bids."  (*Id.* ¶¶ 120-125; *see also id.* ¶¶ 126-138 (discussing additional internal emails from

10  August 2007 through January 23, 2008).)

11          The Court has examined Lead Plaintiffs' allegations of scienter holistically.  It also has

12  taken into consideration BAS's arguments regarding the impact of the global financial crisis on

13  the ARS market.[5]  Although BAS did not completely succeed in reducing its inventory of ARS,

14  and although the emails it sent to its customers included information from which BAS' total

15  ARS inventory could be determined, the Court finds that Lead Plaintiffs' allegations are

16  similar to the allegations in *Defer II* and *Dow Corning*.  Accordingly, the Court concludes that,

17  with respect to the period November 2007 through February 13, 2008, "a reasonable person

18  would deem the inference of scienter cogent and at least as compelling as any opposing

19  inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.[6]

20

21

----

22          [5]      The Court also has considered Lead Plaintiffs' allegations regarding the
    regulatory settlements.  The SEC's complaint against BAS and BAIS also focuses on
23  conduct that occurred in Fall 2007.  *See Securities and Exchange Commission v. Banc of
    America Securities, LLC, et al.*, 09-CV-5170 (S.D.N.Y. June 3, 2009) (available at
24  www.sec.gov/litigation/complaints/comp21066-boa.pdf, last visited February 10, 2011).  In
    addition, BAS did not admit liability as part of that settlement.  The Court concludes that
25  these allegations do not alter its conclusions regarding scienter.  *Cf, UBS*, 2010 WL 2541166,
    at *19 n.11 (finding SEC complaint and settlement of limited value in determining whether
26  plaintiffs sufficiently alleged manipulative acts).

27          [6]      If Lead Plaintiffs choose to amend the CAC, the Court advises the parties that
    it does not intend to limit discovery to this time period, so long as Lead Plaintiffs can show
28  that discovery outside this period is reasonably calculated to lead to the discovery of
    admissible evidence.

United States District Court

For the Northern District of California

1    Hamm alleges that it first purchased ARS in February 2006, and "at times thereafter,"

2    but the last specific date that Hamm alleges it purchased BA ARS is August 30, 2007.  (*Id.* ¶¶

3    99, 102, 154.)  Because Hamm has not alleged that it purchased BA ARS during the time

4    frame for which the Court has found the scienter allegations are sufficient, it fails to state a

5    claim for market manipulation on this basis as well.  *Cf., UBS*, 2010 WL 2541166, at *22 n.12

6    (noting that manipulative conduct that occurred after plaintiffs had purchased ARS could not

7    have affected purchases).

8         **3.    Reliance.**

9    BofA also contends that Lead Plaintiffs fail to allege facts sufficient to satisfy the

10   reliance element of their market manipulation claim.  Damage caused by reasonable reliance

11   "on an assumption efficient market free of manipulation," is an essential element of a market

12   manipulation claim.  *ATSI*, 493 F.3d at 101; *see also Merrill Lynch*, 704 F. Supp. 2d at 393.

13   Lead Plaintiffs assert that they adequately plead direct reliance, and they also argue that

14   reliance should be presumed based on a fraud-on-the-market theory.[7]

15   The fraud-on-the-market presumption is available when the securities at issue trade on

16   an "efficient" market.  *See UBS*, 2010 WL 2541166, at *25.  It "is based on the hypothesis that,

17   in an open and developed securities market, the price of a company's stock is determined by

18   the available material information regarding the company and its business."  *Desai v. Deutsche*

19   *Bank Sec., Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S.

20   _____

21          [7]    Lead Plaintiffs do not contend that they are entitled to a presumption of
     reliance based on *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) in connection
22   with their market manipulation claim.  *See Desai v. Deutsche Bank Sec., Ltd.*, 573 F.3d 931,
     940 (9th Cir. 2009) ("The presumption of reliance under *Affiliated Ute* is limited to cases that
23   'can be characterized as primarily alleg[ing] omissions.'") (*quoting Binder v. Gillespie*, 184
     F.3d 1059, 1064 (9th Cir. 1999), brackets as in *Desai*).
24
             Lead Plaintiffs do rely on a fraud-created-the-market theory of reliance.  However,
25   the Court finds Lead Plaintiffs' reliance on that theory misplaced.  First, the Ninth Circuit
     has not expressly adopted this theory of reliance.  *See Desai*, 573 F.3d at 944 (O'Scannlain,
26   J., concurring); *see also George v. California Infrastructure and Economic Dev. Bank*, No.
     2:09-cv-01610-GEB-DAD, at *8 (E.D. Cal. June 10, 2010).  Second, Lead Plaintiffs allege
27   the ARS market existed for twenty years, and, at least until later Summer and early Fall
     2007, allege that it traded without incident.  Accordingly, even if the fraud-created-the-
28   market-theory is a viable theory of reliance, the Court finds it inapplicable based on the facts
     alleged in this case.

United States District Court

For the Northern District of California

1   224, 241-42 (1988), in turn quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3rd Cir. 1986)

2   (internal quotation marks omitted)); *see also Merrill Lynch*, 704 F. Supp. 2d at 393.  "Because

3   most publicly available information is reflected in market price, an investor's reliance on any

4   public material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action."

5   *Basic*, 485 U.S. at 247.

6          BofA argues that Lead Plaintiffs do not allege facts showing the existence of an

7   efficient market and, thus, cannot invoke the presumption.  Although there is no "set checklist

8   for analyzing market efficiency, courts typically look at '(1) the average weekly trading

9   volume of the [securities], (2) the number of securities analysts following and reporting on

10  them, (3) the extent to which market makers traded in the [securities], (4) the issuer's

11  eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect

12  relationship between unexpected material disclosures and changes in the [securities'] prices."

13  *Merrill Lynch*, 704 F. Supp. 2d at 395 (quoting *Teamsters Local Freight Div. Pension Fund v.*

14  *Bombardier Inc.*, 546 F.3d 196, 200 (2d Cir. 2008)).

15         Lead Plaintiffs allege that the market for ARS had been in existence for over twenty

16  years, that the market had several market makers, including BAS, that ARS were held by a

17  wide variety of investors, and that the ARS market responded to material news, "as evidenced

18  by, among other things, the rapid decline in the market price occurring after the collapse of the

19  auction market in February 2008."  (*See* CAC, ¶¶ 173-177, 179.)  These allegations are similar

20  to the plaintiffs' allegations in both the *UBS* and *Merrill Lynch* cases.  Although those courts

21  noted that the plaintiffs might have difficulty *proving* the existence of an efficient market, they

22  found the plaintiffs sufficiently *alleged* the existence of an efficient market.  *UBS*, 2010 WL

23  2541166, at *25; *Merrill Lynch*, 704 F. Supp. 2d at 395.  The Court finds that the same is true

24  in this case.

25         However, "[a]n efficient market incorporates 'all publicly available information.'"

26  *Merrill Lynch*, 704 F. Supp. 2d at 395 (quoting *ATSI*, 493 F.3d at 101 n.4, in turn quoting

27  *Basic*, 485 U.S. at 246).  As discussed above, much of the conduct about which Lead Plaintiffs

28  complain was disclosed to the market via BofA's website disclosures and the offering

**United States District Court**
For the Northern District of California

memoranda for BA ARS.  (*See* RJN Exs. 1, 8, 20; Second RJN, Ex. 1.)  As in the *Merrill Lynch* case, under a fraud-on-the-market theory, "the ARS market would have incorporated" these materials.  Thus, these disclosures preclude Lead Plaintiffs from establishing a presumption of reasonable reliance on the efficiency of the BA ARS market with respect to their allegations regarding the placement of support bids and the clearing rate.  *Merrill Lynch*, 704 F. Supp. 2d at 395-96; *cf. UBS*, 2010 WL 2541166, at * 22-23 (finding that plaintiffs could not establish that reliance was reasonable "in light of the extensive disclosures contained in the prospectuses, information set forth in SEC documents and reported in press publications").

Moreover, "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."  *Merrill Lynch*, 704 F. Supp. 2d at 398-99 (internal quotations and citations omitted).  Contrary to Lead Plaintiffs' conclusory allegations that they could not, with reasonable diligence, have discovered the information about BAS' placement of support bids or the impact BAS could have on the clearing rate, all of the information described above was in the public domain and available to Lead Plaintiffs.  Thus, assuming Lead Plaintiffs allege facts to show that they directly relied on the efficiency of the ARS market, they fail to allege facts demonstrating that reliance was justifiable.  *See, e.g., id.* at 400-01; *see also Citigroup*, 700 F. Supp. 2d 306-07.

In contrast, BofA did not disclose the rate cap waivers "with the degree of credibility and intensity necessary to counterbalance any misinterpretations resulting from the alleged manipulation."  *Merrill Lynch*, 704 F. Supp. 2d at 395-96.  Accordingly, assuming the Lead Plaintiffs can correct the deficiencies identified in the preceding sections and in the following section, with respect to loss causation, the Court finds that Lead Plaintiffs have alleged sufficient facts to demonstrate a presumption of reliance based on a fraud-on-the-market theory, solely in connection with the rate cap waivers.  *See UBS*, 2010 WL 2541166, at *25 (finding that plaintiffs sufficiently alleged facts to support presumption of reliance in connection with rate cap waivers).

**4.    Loss Causation.**

BofA also argues that Lead Plaintiffs fail to sufficiently allege the loss causation element of their market manipulation claim, and it contends that "ARS auctions failed not because of broker-dealer's bidding practices ... or maximum rate waivers ..., but because the economic crisis spread through the credit markets in 2007-2008, ... affecting ARS as well as other historically safe and liquid investments."  (Opp. Br. at 29:7-12.)  In order to establish loss causation, a "plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *In re Daou Sys.*, 411 F.3d at 1025.  Because the Court has concluded that Lead Plaintiffs cannot establish a market manipulation claim based on broker-dealer bidding practices, the Court limits its evaluation of Lead Plaintiffs' allegations of loss causation to the rate cap waivers.

Although a defendant's alleged fraud need not be the sole reason for an investment's decline in value, a plaintiff still must be able to allege that the defendant's allegedly fraudulent practices were revealed to the market and caused plaintiff's losses.  *See Metzler Inv., GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (citing *In re Daou*, 411 F.3d at 1025-26).  Lead Plaintiffs do not allege when the rate cap waivers were revealed to the market, that any particular auction failed after the disclosure, or that they were unable to liquidate their BA ARS because BofA had not disclosed the rate cap waivers.  (*See generally* CAC ¶¶ 200-213.)  Indeed, the focus of Lead Plaintiffs' loss causation allegations is that the disclosure of BAS's bidding practices and its allegedly abrupt decision to discontinue those practices caused their losses.  As such, Lead Plaintiffs fail to allege facts to show loss causation in connection with the rate cap waivers.

**5.      Conclusion.**

For the foregoing reasons, Lead Plaintiffs fail to state a market manipulation claim against BAS.  Because Lead Plaintiffs fail to allege a primary violation against BAS, they fail to state a Rule 20(a) claim against BAC.  Therefore, the Court GRANTS BofA's motion to dismiss Counts I and II.  However, because it is not clear that Lead Plaintiffs could not cure the deficiencies identified by the Court, it shall grant them one final opportunity to amend their complaint.

**United States District Court**
For the Northern District of California

1

**E.      The Court Dismisses Counts III and IV, Without Leave to Amend.**

2          Lead Plaintiffs also allege that BofA made material misrepresentations and omissions

3   in connection with the sale of ARS, in violation of Rule 10b-5(b) (the "Rule 10b-5(b) claim").

4   To plead a claim based on misstatements or omissions, a plaintiff must allege: (1) a

5   misrepresentation or omission of material fact; (2) made with scienter; (3) in connection with a

6   purchase or sale of a security; (4) on which the plaintiff justifiably relied; and (5) that

7   proximately caused the alleged loss.  *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167,

8   1177 (9th Cir. Oct. 28, 2009); *Zucco Partners*, 552 F.3d at 990.  BofA moves to dismiss Lead

9   Plaintiffs' Rule 10b-5(b) claim on the basis that Lead Plaintiffs fail to allege facts supporting

10   each of these elements.  Because the Court finds that Lead Plaintiffs cannot rely on the

11   *Affiliated Ute* presumption to establish reliance, it dismisses these claims on that basis.

12          Lead Plaintiffs argue that because "[n]othing prohibits [them] from pursuing separate

13   manipulation and omissions claims under different legal theories," they are entitled to rely on

14   the *Affiliated Ute* presumption to establish reliance for their 10b-5(b) claim.  (Opp. Br. at 23

15   n.18.)  This presumption "is limited to cases that 'can be characterized as ... primarily

16   alleg[ing] omissions.'"  *Desai*, 573 F.3d at 940.  In *Desai*, the Ninth Circuit noted that, "[i]n

17   order to succeed, manipulative schemes must usually remain undisclosed to the general public.

18   ... If such nondisclosure of a defendant's fraud was an actionable omission, then every

19   manipulative conduct case would become an omissions case."  *Desai*, 573 F.3d at 941.  As

20   such, the court concluded that the *Affiliated Ute* presumption is not available when a plaintiff

21   alleges "some omissions, but also misrepresentations and secret manipulation."  *Id.*  Because

22   the Court finds that Lead Plaintiffs' omissions allegations are not separable from the

23   manipulative conduct, the Court concludes that they cannot rely on the *Affiliated Ute*

24   presumption to establish reliance.  *Id.* at 941.

25          Accordingly, the Court concludes that Lead Plaintiffs fail to state a claim against BAS

26   for violations of Rule 10b-5(b).  Because Lead Plaintiffs fail to allege a primary violation

27   against BAS, they fail to state a Rule 20(a) claim against BAC.  Therefore, the Court GRANTS

28   BofA's motion to dismiss Counts III and IV.  Because Lead Plaintiffs cannot rely on the

*Affiliated Ute* presumption of reliance with respect to this claim, the Court dismisses Counts III and IV with prejudice.

**CONCLUSION**

For each of the foregoing reasons, BofA's motion to dismiss is GRANTED.  Although this is the fourth iteration of Lead Plaintiffs' complaint, it is the first time the Court has ruled on the sufficiency of the allegations.  The Court cannot say that Lead Plaintiffs could not remedy the defects identified herein, and the Court shall permit Lead Plaintiffs one final opportunity to amend the market manipulation claims.

Therefore, if Lead Plaintiffs wish to file a further amended complaint, they shall file a motion for leave to amend, with a copy of the proposed amendments, by no later than March 25, 2011, and shall notice the motion for hearing on an open and available date on this Court's motion calendar.  If Lead Plaintiffs choose to stand on the allegations set forth in the CAC, they shall file a notice to that effect by no later than March 25, 2011.  Upon receipt of such notice, the Court shall enter a final judgment dismissing the remaining claims with prejudice.

**IT IS SO ORDERED.**

Dated: February 24, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE